### TOM REAVLEY V. THE STATE.

No. 15841.   Delivered June 14, 1933.
Rehearing Denied October 25, 1933.
Reported in 63 S. W. (2d) 709.

The opinion states the case.

*Cantey, Hanger & McMahon,* and *Carlisle Cravens,* all of Fort Worth, for appellant.

*James V. Allred,* Attorney General, *T. S. Christopher,* and *William N. Sands,* Asst. Attys. Gen., and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The conviction is for a misdemeanor; the punishment, a fine of $125.00.

In the conduct of its business, Armour and Company, using motor trucks, hauls its products from the Fort Worth plant to its several branches in Texas. At some periods of the year, notably in the summer, the company is able to transport its produce in its own trucks. At times the volume is too great to be handled by the trucks owned by the company. At such times it is more economical for the company to rent or lease trucks than to buy such additional trucks as may be necessary to take care of the increased business. This is due in a measure to the fact that if additional trucks were bought they would remain idle during the summer months.

Appellant was the owner of the truck and trailer described in the following written agreement:

"Memorandum of agreement made and entered into this Fourth day of April, A. D., 1932, by and between Armour & Company, a corporation, first party, and Thos. W. Reavley, Jr., of Nacogdoches, Texas, second party.

"Whereas second party is the owner of a certain Chevrolet truck and trailer of five tons capacity, motor number T2853565, carrying 1932 license number 166835, suitable for the hauling and delivery of meat and meat food products, and

"Whereas first party, in the operation of its Nacogdoches, Texas, branch house is willing to hire said truck for use in the hauling and delivering of the products sold in said branch,

"Now, therefore, this agreement witnesseth:

"(1) Second party hereby gives to first party the sole and

exclusive use of the truck above mentioned, together with a competent driver for the same, who shall at all times be subject to the control and direction of first party in and about the conduct of its business, in the hauling and delivering of its products as aforesaid.

"(2)   Second party shall keep said truck in good working condition and shall pay all expenses of its operation, including the salary or wages of the driver, and also including any and all city, state or county taxes, fees and licenses.

"(3)   Second party shall also indemnify and hold first party harmless from any claims which may be made against it by the driver or drivers of said truck under the compensation laws of the State of Texas, in the event of injury to said driver or drivers.

"(4)   In the event of said truck becoming disabled because of accident or break-down, or for any other reason, second party shall substitute another truck of equal capacity and serviceability during such time as the truck covered by this contract may be unavailable.

"(5)   It is estimated that said truck will be obliged to travel approximately Thirteen hundred (1300) miles per week over all kinds of roads, but it is expressly understood and agreed that Thirteen hundred (1300) miles shall be regarded only as an average week's travel and that any excess in any week shall not be regarded as a breach of this contract on the part of the first party, nor make it liable to second party for any greater compensation than is hereinafter named.

"(6)   First party shall pay second party the sum of sixty dollars ($60.00) per week as full compensation for the use of such truck, the services of the driver, and all expenses of operating the truck, as above set forth.

"(7)   The driver of said truck shall take receipts from customers of first party, as may be directed, and shall, in the case of C.O.D. orders, collect from such customers before delivery of the goods, and second party shall be responsible to first party for the prompt remittance to first party of all moneys collected from its customers on C.O.D. orders or otherwise.

"The term of this contract shall be six months from the date hereof, but first party shall have the right to terminate the same on ten (10) days notice to second party, in the event of dissatisfaction with the arrangement.

"Executed in duplicate the day and year first above written.

"ARMOUR AND COMPANY

"By (Signed) J. B. Scott

First Party

(Signed)     Thos. M. Reavley, Jr.,
Second Party."

Under the foregoing agreement, appellant's truck was operated over a public highway from Fort Worth to Nacogdoches in carrying the products of Armour and Company. The driver of the truck was employed by appellant. Armour and Company had the sole and exclusive use of the truck. The driver was subject to the control and direction of the company in the conduct of its business in hauling and delivering its products.

On the 31st of May, 1932, authorities stopped the truck in question while it was being driven by the driver employed by appellant in transporting Armour and Company's products along a public highway from Fort Worth to Nacogdoches. The truck was being operated without having obtained a permit from the Railroad Commission.

Subdivision (g), section 1, chapter 277, Acts of the Regular Session, 42nd Legislature, reads:

"The term 'motor carrier' means any person, firm, corporation, company, co-partnership, association or joint stock association, and their lessees, receivers or trustees appointed by any court whatsoever, owning, controlling, managing, operating or causing to be operated any motor propelled vehicle used in transporting property for compensation or hire over any public highway in this state, where in the course of such transportation a highway between two or more incorporated cities, towns or villages is traversed; provided, that the term 'motor carrier' as used in this Act shall not include, and this Act shall not apply to motor vehicles operated exclusively within the incorporated limits of cities or towns."

Subdivision (h), section 1, provides:

"The term 'contract carrier' means any motor carrier as hereinabove defined transporting property for compensation or hire over any highway in this state other than as a common carrier."

Subdivision (a), section 6, of the Act is as follows:

"No motor carrier now operating as a contract carrier or that may hereafter desire to engage in the business of a contract carrier shall so operate until it shall have received a permit from the Commission to engage in such business and such permit shall not be issued until the applicant shall have in all things complied with the requirements of this Act; nor shall such permit be issued unless the character of business being done or to be done by the applicant strictly conforms with the definition of a contract carrier. * * *"

A penalty is provided in the Act for a violation of its provisions.

Appellant takes the position that the evidence on the part of the state shows that the truck was not engaged in the transportation of property for compensation or hire, but was being operated exclusively by Armour and Company in the hauling of its own products. We are unable to bring ourselves to appellant's view. We are constrained to hold that the trial court was warranted in concluding that the method employed was merely a device which enabled appellant to use the truck in transporting property for compensation or hire without first having complied with the statutes to which reference has been made. Under the memorandum of agreement, appellant paid all of the expenses of operation, including the wages of the driver. He kept the truck in good running condition. He agreed to hold Armour and Company harmless from any claim which might be made against said company by the driver under the compensation laws of Texas in the event of injury to the driver. He obligated himself to substitute another truck in the event of a breakdown, or if for any other reason the truck in question could not be used. The contract stipulated the approximate number of miles the truck would be driven a week; provided, that any excess mileage should not be considered as a breach of the contract, nor make Armour and Company liable for greater compensation than sixty dollars per week. Appellant was responsible to the company for the prompt remittance of all collections made by the driver.

The case of Public Utilities Commission of Ohio v. Boughtonville Farmers Exchange Co. et al., 178 N. E., 859, presents a similar situation. The defendant Starkey was engaged in hauling livestock raised by various farmers to the Cleveland Union Stockyards. The livestock was transported by Starkey under a contract with the defendant, the Boughtonville Farmers Exchange Company, by the terms of which Starkey acted as an independent contractor in operating the trucks, and the defendant company made the arrangements for hauling with the farmers, and after the sale at the stockyards remitted the proceeds of the sale, less yardage and commission charged at the stockyards and sixty cents per hundred for the hauling by truck. The sixty cents was divided, ten cents to the defendant company, and fifty cents to Starkey. Transportation was furnished for livestock to all farmers who wanted it, up to the limit of the capacity of the trucks, there being a willingness to carry all livestock that was offered. When the stock were re-

ceived from the farmers, bills of sale from the farmers to the Boughtonville Farmers Exchange Company were executed, which contained the following stipulation: "The title passes to buyer from seller upon the signing of this instrument. Price to be computed at $.60 below the price received by buyer at Cleveland Union Stockyards, whose weights are accepted by both parties. Buyer has three days to make payment." This agreement was executed by the farmer making the sale of the livestock and by the Boughtonville Farmers Exchange Company. In the course of the opinion it was stated that the defendants had not procured a certificate of public convenience and necessity as required of common carriers. The court said that if the defendant company purchased and paid for the stock and then caused it to be transported to Cleveland under special contract with an operator of a truck who did no other work of transportation, such truck operator would not be a common carrier. However, the conclusion was reached that the method employed did not obviate the necessity of a certificate of public convenience and necessity. We quote from the opinion:

"The method of doing business in the instant case, however, amounted to nothing more nor less than a plan of transporting livestock for the public in that vicinity at a charge of sixty cents per hundred. It was merely a device which enabled the truck owner to carry on the work of a common carrier through the defendant company. If such a device could be used to evade the law, all truck owners engaged in transporting goods to market as common carriers could operate under special contract with another person, or a corporation, and avoid the legal necessity of obtaining a certificate of public convenience and necessity."

By analogy, the case from which the above quotation is taken is deemed to support our conclusion that the plan adopted by appellant did not obviate the necessity of obtaining a permit as required by law.

The judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Appellant moves for rehearing. The facts are stated in our former opinion. Briefly,—Armour & Company had goods which they wanted transported from Fort

Worth, Texas, to Nacogdoches, Texas. Appellant had a truck, for whose use in carriage of goods, etc., he wanted pay. A written contract was mutually signed by whose terms Armour & Company got their goods carried to Nacogdoches on appellant's truck, for which they agreed to pay $60.00 per week to appellant. Appellant carried said goods in his truck on a public highway. His sole object in so doing was to earn pay for the use of his truck and his services. Armour & Company were to get their goods carried at the agreed price of carriage. The contract is set out in our former opinion. What each party thereto was to do in the premises is set out.

Construction of a word here and there in such contract would get us nowhere, and could not operate to change or obscure the plain import of the agreement. Appellant was a contract carrier for pay over the highways of this state. Our statutes require that such carrier have a permit before engaging in such occupation. Appellant had none. He thus violated the statute, and his conviction was legal.

There is nothing applicable in Staacke v. Routledge, 241 S. W., 994. It was there merely held that a corporation organized to purchase, sell, or rent automobiles, had authority under its charter to rent them, and that this was not ultra vires. In the case before us Armour & Company were not renting or hiring out their trucks, and there is no question but that appellant had the power to rent out his. The facts in this case, however, show that he operated his truck, oiled it, gasolined it, repaired it, ran it upon the highways, and carried goods in it,— for the contract consideration. The lessee company neither had nor attempted to exercise any control over the management or operation of such truck. The state cites as applicable Shoen v. C. St. P., etc. Ry. Co., 127 N. W., 433; Norton v. Union Traction Co., 110 N. E., 113; Industrial Commission v. Hammond, 236 Pac., 1006. The point involved, i. e., the liability of appellant for his failure to procure a permit to operate said truck, seems plain.

The motion for rehearing is overruled.

*Overruled.*