NEW WAY LUMBER COMPANY ET AL. V. L. A. SMITH ET AL.

No. 7013. Decided July 15, 1936.
Rehearing overruled October 21, 1936.
(96 S. W., 2d Series, 282.)

174

*Snell & Snell, Hofheinz & Aynesworth* and *Frank E. Mann*, all of Houston, for plaintiffs in error.
As plaintiffs were operating their own trucks to deliver their own merchandise, they were not operating as "motor carriers for compensation or hire" as defined by Article 911b of the Revised Civil Statutes. Frost & F. Trucking Co. v. Railroad Commission, 271 U. S., 583, 70 L. Ed., 1101, 46 Sup. Ct., 605; Anderson, Clayton & Co. v. State of Texas, 125 Texas, 453, 82 S. W. (2d) 941.

The plaintiffs in error have such vested rights in their business as will entitle them to come into a court of equity and restrain defendants from interfering with their proper use of the State highways in connection therewith. J. H. McLeish & Co. v. Binford, 52 Fed. (2d) 151; Allred v. J. C. Engleman, Inc., 123 Texas, 205, 61 S. W. (2d) 107; Bean v. Reeves, 77 S. W. (2d) 737.

*William McCraw*, Attorney General, and *Vernon Coe*, Assistant Attorney General, for defendant in error.
MR. JUSTICE SHARP delivered the opinion of the court.

We adopt the following statement from the opinion of the Court of Civil Appeals:

"This is an appeal from an order of the District Court of the 55th Judicial District, Harris County, Texas, granting a

temporary injunction restraining and enjoining defendants in the trial court (appellants here), L. A. Smith, C. V. Terrell, and E. O. Thompson, who compose the Railroad Commission of Texas, the Railroad Commission of Texas itself, Mark Marshall, Director of Motor Transportation for the Railroad Commission of Texas, L. G. Phares, Chief of the State Highway Patrol; Carl Nesbitt, Adjutant General of Texas, and all deputies, inspectors, employees and representatives of the Railroad Commission of Texas and the Director of Motor Transportation; all members of the State Highway Patrol, as well as other representatives of the law enforcement division of the Highway Department, all State Rangers and representatives of the Adjutant General's Department; all Sheriffs, deputy sheriffs, constables, deputy constables, and all police or peace officers of whatever character, and servants, agents and representatives from stopping, weighing, searching, examining, arresting, moving or otherwise molesting or interfering with certain trucks, being those owned by New Way Lumber Company and other plaintiffs in this cause, without a warrant of arrest for the driver or a search warrant duly and properly issued as provided by law, and from stopping, searching, arresting, examining, questioning, delaying or otherwise molesting or interfering with plaintiffs, or either of them, or of any driver of trucks owned by plaintiffs, S. A. Lovelady and W. S. Dunbar, or New Way Lumber Company, in order to discover any violation of Article 827a of Revised Penal Code of Texas (Vernon's Ann. P. C.), or of any other law regulating the operation of motor trucks on the State Highways of the State of Texas, without a warrant of arrest for the driver, or a search warrant duly and properly issued as provided by law."

The Court of Civil Appeals held that the order entered by the trial court was improvidently issued, and that the judgment of that court should be reversed and the temporary injunction dissolved. 84 S. W. (2d) 1104.

The first question considered is: Does the operation of the trucks by the New Way Lumber Company upon the public highways of this State require that a permit be obtained from the Railroad Commission, by virtue of the provisions of H. B. 335, now Art. 911b, Vernon's Annotated Texas Civil Statutes? The pertinent parts of the Act applicable here read as follows:

"Sec. 1. * * *

"(f) The term 'permit' means the permit issued to contract carriers under the terms of this Act.

"(g) The term 'motor carrier' means any person, firm,

corporation, company, co-partnership, association or joint stock association, and their lessees, receivers or trustees appointed by any Court whatsoever, owning, controlling, managing, operating or causing to be operated any motor propelled vehicle used in transporting property for compensation or hire over any public highway in this State, where in the course of such transportation a highway between two or more incorporated cities, towns or villages is traversed; * * *

"(h) The term 'contract carrier' means any motor carrier as hereinabove defined transporting property for compensation or hire over any highway in this State other than as a common carrier.

"Sec. 2. No motor carrier, as defined in the preceding section, shall operate any motor propelled vehicle for the purpose of the transportation or carriage of property for compensation or hire over any public highway in the State except in accordance with the provisions of this Act. * * *

"Sec. 3. No motor carrier shall, after this Act goes into effect, operate as a common carrier without first having obtained from the Commission, under the provisions of this Act, a certificate of public convenience and necessity pursuant to a finding to the effect that the public convenience and necessity require such operation. No motor carrier shall, after this Act goes into effect, operate as a contract carrier without first having obtained from the Commission a permit so to do which permit shall not be issued until the applicant shall have in all things complied with the requirements of this Act.

"Sec. 4. (a) The Commission is hereby vested with power and authority and it is hereby made its duty to supervise and regulate the transportation of property for compensation or hire by motor vehicle on any public highway in this State. * * *

"Sec. 5. No motor carrier shall hereafter operate as a common carrier for the transportation of property for compensation or hire over the public highways of this State without first having obtained from the Commission under the provisions of this Act a certificate declaring that the public convenience and necessity requires such operation. * * *

"Sec. 6. (a) No motor carrier now operating as a contract carrier or that may hereafter desire to engage in the business of a contract carrier shall so operate until it shall have received a permit from the Commission to engage in such business and such permit shall not be issued until the applicant shall have in all things complied with the requirements of this Act; nor shall such permit be issued unless the character of business

being done or to be done by the applicant strictly conforms with the definition of a contract carrier. * * *"

Plaintiffs in error contend, on the one hand, that they are not "motor carriers for compensation or hire" within the provisions of Art. 911b, because of the fact that they charge more for their building materials delivered to their customers by their own trucks than they charge at the point of origin. On the other hand, the State contends that because the trucks are used on the public highways of this State to deliver goods to the consumers, and, furthermore, because the cost of delivery, based upon the mileage covered in the delivery to their customers is added to the price thereof, plaintiffs in error are motor carriers for compensation or hire, and come under the provisions of the law.

The testimony is undisputed that plaintiffs in error are operating trucks, both loaded and unloaded, which are sought to be regulated, along the non-urban highways of this State. The headquarters of plaintiffs in error is located at Houston. The general manager testified that they carry their lumber in trucks to various points in Texas, for which carrying they make a charge for the expense of delivery, which is above the regular price therefor. The difference is based upon the weight and distance, the same as railroads do. The price list is based upon f. o. b. mills price, and the distance is computed for the delivered price.

Texas has a comprehensive program for the building and maintenance of its public highways. Many laws have been passed relating to the subject. A Highway Commission has been created for this purpose. Some of the outstanding Acts enacted are H. B. 336, Acts of 1931, 42nd Leg., chap. 282, page 507, and S. B. 11, Chap. 42, Acts of 1929, Gen. Laws of Texas, 41st Leg., 2nd and 3rd Called Sessions, page 72, now Art. 827a et seq. of Vernon's Annotated Penal Code, and H. B. 335, Acts of 1931, 42nd Leg., Chap. 277, page 480, now Art. 911b, Vernon's Annotated Texas Civil Statutes. We cite some of the leading cases construing these Acts. H. B. 336, now part of Art. 827a of the Penal Code, was upheld in the following cases: Sproles v. Binford, 286 U. S., 374, 52 Sup. Ct., 581, 76 L. Ed., 1167; Ex parte Sterling, 122 Texas, 108, 53 S. W. (2d) 294; Ex parte Phares, 122 Texas, 104, 53 S. W. (2d) 297; Holyfield v. State, 124 Texas Crim. Rep., 422, 63 S. W. (2d) 386; Stone v. State, 126 Texas Crim. Rep., 491, 72 S. W. (2d) 1118. Likewise, H. B. 335, Art. 911b of the Civil Statutes, has been construed and sustained in the following cases: Stephenson v. Binford, 287 U.

S., 251, 53 Sup. Ct., 181, 77 L. Ed., 288; Anderson, Clayton & Co. v. State ex rel. Atty. Gen., 122 Texas, 530, 62 S. W. (2d) 107; Shupee v. Railroad Commission, 123 Texas, 521, 73 S. W. (2d) 505; Texas & Pacific Motor Transport Co. v. Railroad Commission, 124 Texas, 126, 73 S. W. (2d) 509; Texas Motor Coaches, Inc. v. Railroad Commission, 123 Texas, 517, 73 S. W. (2d) 511.

The number of motor vehicles operated on the highways presents many vital questions, among which is the safety of the traveling public and the protection of the highways. The number of motor vehicles using the highways is increasing each year. Chief Justice Hughes, in rendering the opinion for the Supreme Court of the United States in the case of Sproles v. Binford, 286 U. S., 374, 52 Sup. Ct., 581, 76 L. Ed., 1167, which involved H. B. No. 336, regulating vehicles on highways, Acts 42nd Leg., 1931, Chap. 282 (now Art. 827a, Sec. 1 et seq., Vernon's Annotated Penal Code), upheld the law and stated briefly some of the facts relating to the public highways of this State and the number of motor vehicles using same, in the following language:

"The District Court made comprehensive findings. These set forth the various interests of the complainant and interveners (common carriers and contract carriers, in intrastate and and interstate commerce, and manufacturers and distributors of commodities), their large investments, the extent of their operations in highway transportation, the character and uses of their equipment, and the losses to which they would be subjected by requirements of the statute. Other findings may be summarized as follows:

"Of all the registered vehicles on the highways, including trucks, buses and automobiles, less than four-tenths of one per cent have a rated carrying capacity of more than 7,000 pounds. Not more than 5,500 trucks, out of a total of 206,000, have such a capacity and are affected by the prescribed load limit. There are approximately 200,000 miles of state and county highways in Texas and less than 20,000 miles of these are State Designated Highways, the improvement of which represents a public investment of more than $250,000,000. The annual maintenance cost of State Designated Highways for the past three years averaged $12,000,000, and that of the more than 180,000 miles of county highways 'is many millions of dollars annually.' In enacting the statute, 'the Legislature of Texas found as a fact that 7,000 pounds load weight, plus the weight of the vehicle, is the maximum load that should be allowed to pass over the Texas highways, taking into consideration the manner

of past and present construction, probable future construction, cost of maintenance, strength of bridges, condition of traffic, etc.,' and this finding of the Legislature is supported by the preponderance of the evidence before the court.

"There are highways of concrete and other rigid and semirigid types of construction, and also bridges, capable of carrying a greater load than 7,000 pounds, but these do not form a regularly connected system and are scattered throughout the State. There are all types of roads, 'ranging from dirt, gravel, shell, asphalt and bitulithic to concrete and brick highways' of varying degrees of strength; the operations of complainant and interveners, and others similarly circumstanced, are conducted over all these types of highways, and bridges, except in some instances where operations may be over a regular route. The statute was enacted in the interest of the whole State, and the State highway system in particular, and the operations of complainant and interveners constitute a very small portion of the traffic which the highways bear.

"The number of trucks in use in Texas has increased 300 per cent in the last six years; official registrations show an increase from 65,536 in 1924 to 206,527 in 1930, not including the large increase in interstate truck traffic; and this increase in 'truck density' justifies the dimensional and weight restrictions of the statute in the interest of public safety and convenience and highway protection. In 1930, there were only 900 passenger buses operating over the Texas highways, representing less than .004 of one per cent of the total number of vehicles; these passenger buses, while similar in many respects in construction to trucks carrying freight, are specially equipped to haul passengers, operate under regulations of the railroad commission and under conditions wholly different from those of trucks; that the difference between these two types of vehicles and the number of each type, and in their operation, is ample justification for legislative classification. Excessive loads on trucks are damaging the highways and the limitation of the net load to 7,000 pounds will cause a saving to the State in maintenance costs. Heavily loaded trucks cause accidents and reduced loads will result in greater safety."

The legislative history of the statutes bearing upon this subject clearly shows that the purpose of this Act is: (a) "to further regulate motor carriers transporting property for hire over the public highways," and (b) "placing all motor carriers under the jurisdiction of the Railroad Commission." The term "motor carrier" as defined in the Act includes everyone operat-

ing "any motor-propelled vehicle used in transporting property for compensation or hire over any public highway in this State," and excepts those "operated exclusively within the incorporated limits of cities or towns." The term "common carrier" has long had a definite meaning in this State, and the Legislature saw no necessity for defining that term. However, the Legislature did see fit to define the terms "motor carrier" and "contract carrier." Thus it clearly appears in subsections (g) and (h) of Section 1 of the Act that the Legislature intended to bring under the Act every person who operates any motor-propelled vehicle in transporting property for compensation or hire on the public highways, outside of cities, either as a common carrier or as a contract carrier.

■ The highways of the State are public property, and their use for purposes of gain may be regulated or prohibited by the Legislature, as it sees fit. Ex parte Sterling, 122 Texas, 108, 53 S. W. (2d) 294; Robbins et al. v. Limestone County et al., 114 Texas, 345, 268 S. W., 915; Shupee v. Railroad Commission, 123 Texas, 521, 73 S. W. (2d) 505; Stephenson v. Binford, 287 U. S., 251, 53 Sup. Ct., 181, 77 L. Ed., 288, 87 A. L. R., 721. The power of the State to regulate traffic over public highways is well settled. This power includes the right to permit or prohibit motor vehicles, operated for compensation or hire, to use its public highways under such rules and regulations as the Legislature may see fit to prescribe; and the Railroad Commission, or any other tribunal, may be authorized to carry out the details of such rules.

The case of Stephenson v. Binford, supra, involved the construction of this Act (now Art. 911b). Mr. Justice Sutherland in a very exhaustive opinion, speaking for the Supreme Court of the United States, sustained this statute, and in the course of his opinion said:

"There is ample support in the record for the following findings of the court below:

" 'The evidence shows there are 1,360,413 motor vehicles other than either common or contract carriers or commercial carriers of passengers registered for use on the highways of Texas, and that it is one of the purposes of the Legislature to make the use of the highways safer and more convenient for these private operators, involving incidentally either a lessening of commercial transportation on the highways, or such improvement in their character and practices as to effect the same result. In this connection, the Court finds that the provisions

of the statute carried out in accordance with the declaration of purpose and the specific instructions therein will have the effect either of lessening commercial traffic on the highways, or, by bringing it under careful and adequate supervision, of making the use thereof by the very large number of owners and operators of private motor vehicles safer and more convenient.

" 'The increase of unregulated truck transportation over the highways had developed a difficult and perplexing public problem to the extent that the Governor of the State in his message to the Legislature called attention to the fact that the highways were being taken and badly used by motor vehicles engaged in the transportation of freight for hire.

" 'The number of contract carriers on the highways of Texas having rapidly grown, as elsewhere found, the business they conduct now exists as a very large factor in commercial transportation. The court finds that it is not the effect of one such carrier or a limited number thereof which produced the serious problem with which the Legislature of Texas purported to deal and has dealt, but it is the effect, in the aggregate, of such contract carriers that is important.

* * * * * * *

" 'The requirement of the Texas statute under attack that contract carriers must have a permit with the prerequisites in the statute for such a permit, is reasonable, particularly in that this method enables the State to know who will use its highways and to more efficiently regulate such use. The permit system has immediate relation to the condition of the roads and bridges, congestion of the highways and the character of equipment to be used, which relates not only to the effect of the operations on business but also to the problem of safety and convenience in use of the highway.' "

He concluded the opinion in the following language:

"Nor do we find merit in the further contention that the act arbitrarily discriminates against appellants because it does not apply to persons, commonly known as 'shipper-owners,' who are transporting their own commodities under substantially similar conditions. It is obvious that certain provisions of the statute, like that requiring the commission to fix minimum rates, can have no application to such owners. We are of opinion, from an examination of the act and the companion act which was upheld by this court in Sproles v. Binford, supra, that all provisions relating to contract carriers which are germane to shipper-owners are made applicable to them.

In any event, it is not shown that the act thus far has been so administered as to result in any unlawful discrimination."

It is evident that the Legislature intended to vest in the Railroad Commission the power to issue, upon application, to those persons who desire to engage in transporting for hire over the highways certain commodities named in the Act, special permits, upon such terms as the Commission may see fit. Part of Subdivision (d) of Section 6 of the Act reads:

"(d) The Railroad Commission is hereby given authority to issue upon application to those persons who desire to engage in the business of transporting for hire over the highways of this State live stock, mohair, wool, milk, live stock feed stuffs, household goods, oil field equipment, timber when in its natural state, farm machinery and grain special permits upon such terms, conditions and restrictions as the Railroad Commission may deem proper, and to make rules and regulations governing such operations keeping in mind the protection of the highways and the safety of the traveling public * *. *."

Oklahoma passed a statute similar in many respects to the Act before us. The Supreme Court of that State, in the case of Collins-Dietz-Morris Co. v. State Corporation Commission, 154 Okla., 121, 7 Pac. (2d), 123, 80 A. L. R., 561, which involved a similar state of facts, held as follows:

"There the price of the goods delivered includes a direct charge for the delivery thereof. The cost of the delivery not only is reflected in the price of the goods delivered, but the price of goods delivered is greater than the price of goods sold by the same wholesale house that are not delivered. That the title to the goods remains in the vendor until delivered is immaterial. Since the seller receives compensation for the delivery of the merchandise, we must conclude that the legislative intent, as shown by the terms of the act, was that this delivery be included in the provisions of the act."

It is contended that the case of Anderson, Clayton & Co. et al. v. State et al., 122 Texas, 530, 62 S. W. (2d) 107, and 82 S. W. (2d) 941, controls this case. An examination of that case, as reported in 122 Texas, 530, 62 S. W. (2d) 107, supra, shows that the State voluntarily filed a suit in the District Court of Nueces County against Anderson, Clayton & Co., for the purpose of testing the right of Anderson, Clayton & Co. to operate their own trucks upon the public highways of Texas without a permit as provided for under Art. 911b, and to collect certain penalties therefor. The contention in that case was that the trucks being operated did not come under the

provisions of the Act, and the suit was filed by the State to determine that question. The Court of Civil Appeals certified to this Court three questions, as follows:

"1. Did the District Court of Nueces County acquire jurisdiction over the defendants named in the cross bill of cross petitioners?

"2. Did cross petitioners have such property rights as would authorize a court of equity to entertain jurisdiction of the matters alleged in the cross bill?

"3. Were cross petitioners operating the leased trucks for compensation or hire under the provisions of Chapter 277, Acts of the 42nd Legislature, known as House Bill 335?"

In answer to the first question, it was held that since the State invoked the jurisdiction of the District Court of Nueces County to sue the defendants for certain penalties, and to restrain them and their employees from violating the provisions of H. B. 335 (Art. 911b), it was bound by the jurisdiction of that court. Question No. 2 involved the power of the trial court to issue injunctive proceedings enjoining criminal proceedings against defendants pending the litigation, to prevent irreparable injury to the business and property of defendants, who were transporting their own cotton in their own and leased trucks. The issue was sharply drawn as to whether or not the vehicles operated by the defendants were subject to the provisions of this Act. It was held in that case that since the State had filed the suit to determine that very question, the trial court had jurisdiction to issue injunctive proceedings restraining the officers from having the truck drivers arrested until the questions before the court were finally determined. The Court refused to answer the third question because it presented a question of fact. We refer to the opinion in that case for a full discussion of the facts and issues before the Court for decision. The case again came before this Court (125 Texas, 453, 82 S. W. (2d) 941), and the opinion rendered in 122 Texas, 530, 62 S. W. (2d) 107, was followed in holding that it was a question of fact, to be determined from all the facts and circumstances, as to whether or not the owners operating the trucks are motor carriers as defined by law, and subject to the provisions of the Article. However, if any inconsistency should appear between the views expressed in this opinion and those contained in one or both of the foregoing opinions, the rule expressed herein shall control.

■ Under the facts stated here the carrying of lumber owned

by the Company in its own trucks does not exempt it from the provisions of this law. This is not a case where the trucks are operated exclusively within the incorporated limits of a town or city; nor is it a case where the price of the goods delivered is the same as those undelivered. On the contrary, it is clearly a case where the price of the lumber includes a direct charge for the delivery thereof. The carrying charge is based directly on the distance traveled and the weight of the truck. Since the Company receives compensation for the delivery of the lumber, it clearly appears that the trucks used come under the definition of a "contract carrier," and are subject to the provisions of Art. 911b.

■ Plaintiffs in error contend that Section 6 of Art. 827a of the Penal Code is void, because it violates Sections 9, 10, 13, 17, and 19 of Art. 1, and Section 1 of Art. 2, and Section 1 of Art. 5 of the Constitution of Texas, and the Fourth Amendment to the Constitution of the United States, and that it is indefinite and meaningless, in that no gross weight is set out in the statute. Section 6 was part of S. B. No. 11, supra, and is now embraced in Art. 827a. This is a criminal statute, and, so far as we know, the precise question involved here has never been passed upon by a court prescribed for the trial of criminal cases. However, Sections 5 and 5b of Art. 827a have been upheld by the Court of Criminal Appeals in the cases of Holyfield v. State, 124 Texas Crim. Rep., 422, 63 S. W. (2d) 386, and Stone v. State, 126 Texas Crim. Rep., 491, 72 S. W. (2d) 1118. Section 6 of Art. 827a, Penal Code, reads:

"Any license and weight inspector of the State Highway department, having reason to believe that the gross weight of a loaded vehicle is unlawful, is authorized to weigh the same either by means of portable or stationary scales, and to require that such vehicle be driven to the nearest scales in the event such scales are within two miles. The inspector may then require the driver or operator to unload immediately such portion of the load as may be necessary to decrease the gross weight of such vehicle to the maximum gross weight specified by this Act."

This section should be construed in the light of and in connection with the other sections, and particularly Sections 5 and 5b, embraced in Art. 827a, which prescribe the weight of the load authorized to be carried.

It will be noted that this Act provides in detail as to how the provisions of same shall be enforced. Section 16 in part reads:

"To insure the adequate enforcement of this Act and all other laws relating to vehicles and their use on the public highways, the State Highway Department is hereby authorized to and shall employ one hundred twenty (120) State Highway Patrolmen, in which shall be included all License and Weight Inspectors now authorized by Law, who shall be charged with the duty of strictly enforcing said laws. * * *"

This section further provides how the number of these patrolmen shall be divided, and their salaries are fixed. It further provides for the establishing and maintenance of a training school for State highway patrolmen, and that before such patrolmen shall be permanently appointed they shall take a course of training in a school, and that when appointed they shall be given a commission, and shall be charged primarily with the duty of enforcing all the State laws relating to vehicles and public traffic on the public highways; and they are also vested with all the rights and powers of peace officers, to pursue and arrest any person for any offense, when said person is found on a highway. Each person appointed as a highway patrolman shall, before entering upon the duties of such office, take and subscribe the constitutional oath, and shall also execute a bond in the sum of $1000.00, conditioned that he will fairly and faithfully perform all the duties required of him by law, and that he will fairly and impartially enforce the laws of this State.

Section 16a of the Act reads as follows:

"The State Highway Patrol, License and Weight Inspectors, Headlight Division and any other Law Enforcement Agencies now in existence or hereafter created in connection with the Highway Department shall be known as the Law Enforcement Division of the Highway Department. This Division shall be under the Chief of the Highway Patrol as the Executive Head who shall work directly under and be responsible to The Highway Commission only. (As added Acts 1931, 42nd Leg., p. 278. ch. 164, sec. 1.)"

Article 4413, (12) R. C. S., reads as follows:

"(4) The officers, non-commissioned officers and enlisted men of the Texas Highway Patrol shall be, and they are hereby clothed, with all the powers and authority which they now have, and exercise as members of the State Highway Motor Patrol of Texas, and their duties and functions shall be the same as the duties and functions they are now performing. In addition, they shall be, and they are hereby clothed with all the powers and authority which is in this Act, or otherwise, by law

given to members of the Texas Ranger Force. (Acts 1935, 44th Legislature, p. 444, Chapter 181, Sec. 12.)"

Turning to Article 4413, (11), which deals with the powers of the Texas Ranger Force, we find the following language:

"(4) The officers shall be clothed with all the powers of peace officers, and shall aid in the execution of the laws.

"They shall have authority to make arrests, and to execute process in criminal cases; and in civil cases, when specially directed by the Judge of a Court of Record; and in all cases shall be governed by the laws regulating and defining the powers and duties of sheriffs when in the discharge of similar duties; except that they shall have the power and shall be authorized to make arrests and to execute all process in criminal cases in any county in the State. All officers operating by virtue of this Act shall have the authority to make arrests, as directed by warrants, and *without a warrant* under the conditions now authorized by law, and also *in all cases when the alleged offender is traveling on a railroad, in a motor vehicle,* aeroplane or boat * * *." (Italics ours.)

Articles 212, 213, and 215 of the Code of Criminal Procedure of Texas prescribe in what manner a peace officer or any other person may, without warrant, make an arrest.

A reading of the sections of the two Constitutions referred to clearly shows that the only two sections pertinent to the discussions here are Section 9 of Article 1 of the Constitution of the State and the Fourth Amendment to the Constitution of the United States. Section 9 of Article 1 of the Constituion of this State reads:

"The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation."

The Fourth Amendment to the Constitution of the United States reads:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The foregoing sections of the Constitution of the State and of the Constitution of the United States have been repeatedly construed by both Federal and State courts. The case of Car-

roll v. U. S., 267 U. S., 132, 69 L. Ed., 543, 45 Sup. Ct. Rep., 280, 39 A. L. R., 790, involved the construction of the National Prohibition Act (27 U. S. C. A.), in connection with the Fourth Amendment to the Constitution of the United States. Chief Justice Taft, in an exhaustive opinion, reviewed the holdings of the Supreme Court of the United States upon this question, and, among other things, in that opinion said:

"The intent of Congress to make a distinction between the necessity for a search warrant in the searching of private dwellings and in that of automobiles and other road vehicles in the enforcement of the Prohibition Act is thus clearly established by the legislative history of the Stanley Amendment. Is such a distinction consistent with the Fourth Amendment? We think that it is. The Fourth Amendment does not denounce all searches or seizures, but only such as are unreasonable."

"On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid."

"We have made a somewhat extended reference to these statutes to show that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."

The foregoing holding in the Carroll Case has been followed by the Supreme Court of the United States and by the courts of many other jurisdictions.

In the case of Odenthal v. State, 106 Texas Criminal Rep., 1, 290 S. W., 743, Presiding Judge Morrow, in a very exhaustive opinion, reviews the authorities upon this question, and approves the holding of the Supreme Court of the United States in the case of Carroll v. U. S., supra. The question came before the Court of Criminal Appeals again in the case of Coats v. State, 108 Texas Crim. Rep., 298, 1 S. W. (2d) 288, and Judge Hawkins, speaking for the Court, reviews the many articles of the Statutes and Code of Criminal Procedure bearing on this

subject, and again approves the holding in the Carroll Case, supra, in the following language:

"Article 690, P. C., declares 'any animal, automobile, flying machine, airplane, boat, ship, or other vehicle or instrumentality used for the unlawful transportation or storage of intoxicating liquor,' to be a public nuisance, and authorized peace officers to seize without warrant any such instrumentalities used in their presence and view either for the unlawful transportation or storage of intoxicating liquor, or for the commission of any other act made penal by chapter 7 (title 11) of the Penal Code. Following Carroll v. U. S., 267 U. S., 132, 45 S. Ct., 280, 69 L. Ed., 543, 39 A. L. R., 790, this court held in Odenthal v. State, 106 Texas Crim. Rep., 1, 290 S. W., 743, that, if an officer was in possession of information, or had knowledge of facts in advance of the search which amounted to 'probable cause,' he would be authorized without a search warrant to search an automobile. The holding was based upon the theory that such a search was not 'unreasonable,' and therefore not in violation of the Constitution or laws of either this State or the United States, and was in consonance with the spirit of the law as announced in said article 690."

The dominant purpose of the laws enacted on this subject is the safety of the public from injury and loss of life through the operation of motor vehicles on the public highways. It is a matter of common knowledge that many persons are injured, and many lives lost, through the operation of motor vehicles on the public highways. The law also has for its reasonable purpose the protection of the highways from the operation of overloaded trucks thereon. Under the law, officers designated to enforce the provisions thereof should have the right to demand that operators of motor vehicles show their permits issued by virtue of Art. 911b, without a search warrant. If it were necessary that a search warrant should be required to obtain such information, one of the main purposes of the law would be nullified. If an officer authorized to enforce the law approaches the driver of a motor vehicle for the purpose of ascertaining if he has a permit to operate the same on the public highways, and the driver declines or refuses to show such permit, it logically follows that the officer would have probable cause to believe that the motor vehicle is being operated on the public highways in violation of law. Likewise, Section 6 authorizes an inspector to stop a vehicle and weigh it, if he has reason to believe that its load exceeds that allowed by law; and, if the load is excessive, require the operator to reduce it

to the amount prescribed by the Act. It clearly appears that this section of the Statute does not prohibit the use of motor vehicles on the public highways, but is merely a regulation of their use. Therefore, if the officer should have probable cause to believe that a motor vehicle is being operated without a permit, or that it is being operated with an unlawful load, he would have the right, without a search warrant, to stop the driver and question him about his right to operate a motor vehicle upon the public highways, and, if need be, ascertain whether the operation of the motor vehicle is in violation of law; and if such driver is operating the motor vehicle in violation of law, arrest him without a warrant. To hold otherwise would render ineffective the reasonable and wholesome laws enacted for the protection of the public and the highways.

■ Plaintiffs in error have no vested rights in the public highways of the State, and are subject to the regulations prescribed by the Legislature. The Legislature has prescribed reasonable regulations for the protection of the public and the public highways, as contained in the foregoing Acts. We have carefully considered Section 6 of Art. 827a, and, when read in the light of the other provisions of the law, we think it valid and enforceable.

This record shows that in this case all the acts of which plaintiffs in error complain were done by officers described in the Act and authorized to enforce the law. The question as to the power of other officers, such as constables, sheriffs, etc., not described in this law, to enforce the provisions thereof is not before us for decision, and upon that question we express no opinion.

The judgment of the Court of Civil Appeals, dissolving the temporary injunction and reversing the judgment of the trial court, will be affirmed.

Opinion delivered July 15, 1936.

Rehearing overruled October 21, 1936.