STATE of Texas, Appellant,

v.

Tom BOUNDS and Mercedes Co-Operative Gin, Appellees.

No. 1396.

Court of Civil Appeals of Texas, Corpus Christi.

May 17, 1979.

Rehearing Denied June 7, 1979.

Joe N. Pratt, J. David Hughes, R. Lambeth Townsend, Austin, Juan J. Hinojosa, McAllen, for appellant.

William L. Hubbard, Bonner & Bonner, Harlingen, for appellee.

OPINION

BISSETT, Justice.

This is a suit brought by the State of Texas to enforce the provisions of Tex.Rev. Civ.Stat.Ann. art. 911b, the "Texas Motor Carriers Act,"[1] to recover civil penalties thereunder and for an injunction. Trial was to the court, sitting without a jury. Judgment was signed on May 24, 1978, which denied all relief prayed for by the State. The State has duly perfected an appeal from that judgment.

The State alleged that Tom Bounds acted unlawfully as a motor carrier on 38 separate days during the period from July, 1976, to September, 1976, in that he transported property for compensation or hire over a public highway in Texas between two incorporated cities without having first obtained a certificate of public convenience and necessity or a permit from the Railroad Commission authorizing such transportation, in violation of the Act. It further alleged that Mercedes Co-operative Gin aided and abetted Bounds in such unlawful operation, in violation of the Act. Both defendants denied such allegations.

■ The controlling question presented by this appeal is whether or not Bounds was a motor carrier for compensation or hire, as defined by the Act, who was required to possess either a certificate of public convenience and necessity from the Railroad Commission or a permit from the Commission during the trucking operation here involved. The question is one of fact, to be determined from all the facts and circumstances in evidence. *Anderson, Clayton & Co. v. State*, 125 Tex. 453, 82 S.W.2d 941 (1935, opinion adopted); *New Way Lumber Co. v. Smith*, 128 Tex. 173, 96 S.W.2d 282 (1936). If it be held that he was a motor carrier who violated the Act, then, the next issue to be resolved is whether or not the Gin aided or abetted him in the violation.

The Gin is in the business of ginning cotton. As an adjunct to its business, it sold cottonseed to Valley Co-op Oil Mill and received a sales price therefor plus the per ton freight rate set by the Railroad Commission of Texas, which regulated cottonseed shipments. Prior to the 1976 ginning season, the Gin used its own trucks to haul cottonseed to Valley Co-op. For the 1976 season, the Gin changed its trucking operation and leased trucks owned by Bounds to transport the cottonseed from Mercedes, Texas, and Edcouch, Texas, where two of its gins were located, to Valley Co-op, at Harlingen, Texas. The transportation of the cottonseed sold by the Gin to Valley Co-op was over public highways between two or more incorporated cities. It was stipulated that Bounds did not possess a certificate of public convenience and necessity from the Railroad Commission which would authorize him to operate as a common carrier to transport cottonseed for hire over the highways of this State. Counsel for Bounds judicially admitted that Bounds did not have a permit from the Commission.

Bounds leased three trucks to the Gin under three written leases, each of which covered a particular truck. The term of

---

1. The Texas Motor Carriers Act will be referred to in this opinion as the "Act."

each lease was 120 days. Compensation "as rental for said vehicle" was 60¢ per mile for each mile "Lessee operates said vehicle." All of the leases are in identical language, and each contains the following provisions:

"[L]essee agrees to furnish all gasoline and motor oil necessary to operate said vehicle during said period (of lease), and to also furnish at his own expense the driver and assistant driver . . . ."

\* \* \* \* \* \*

"It is understood and agreed that Lessee shall have full possession and control of the equipment herein described at all times during the term of this lease . . Lessee shall select and employ the driver or operator of the vehicle, and that such driver or operator shall at all times be under the control, domination and direction of Lessee . . . ."

Subsequent to the execution of the leases, the parties, at the suggestion of the Gin's manager, entered into an oral agreement, whereby it was agreed that Bounds would be paid either the rental of 60¢ per mile as provided by the leases, or the total of the per ton freight rates that the Gin received from Valley Co-op, less all expenses incurred by the Gin in hauling the cottonseed from its gins to Harlingen, whichever was to his advantage.

Copies of the written leases were filed with the Department of Public Safety, as required by Tex.Rev.Civ.Stat.Ann. art. 6701c–1 (1977). A written memorandum of the oral agreement was not so filed.

The Gin maintained an "accounts receivable" for Bounds. Posted to that account were certain advancements made by the Gin to Bounds, purchases of gasoline and oil for the trucks under lease, other expense items relating to the operation of the trucks, and all wages paid to the several truck drivers. The Gin deducted the amount of social security taxes chargeable to the truck driver from each check given to the drivers of the leased trucks as wages, and paid that amount to the Internal Revenue Service. The social security taxes so paid by the Gin for the truck drivers were not posted to Bounds' "accounts receiva-

ble," and Bounds did not reimburse the Gin for such social security taxes.

On October 4, 1976, a final settlement was reached. Bounds received a check from the Gin for the total of the "freight rates" ($11,741.46) collected by the Gin from Valley Co-op. In turn, Bounds delivered his check to the Gin for the balance shown on the "accounts receivable" ($5,127.62).

Bounds admitted that he was in the trucking business at the time he entered into the lease agreements. He owned six trucks. The three which were not under lease to the Gin were used by him in "hauling cotton" under a "permit on them."

The trial court found that during the time in question: Bounds did not have, nor did he exercise, any authority to hire or fire any of the truck drivers who drove the leased trucks; Bounds did not have, nor did he exercise, any authority relating to the rate of pay, working hours, or details of job performance with respect to the truck drivers; Bounds did not have, nor did he exercise, any authority as to the maintenance of the trucks; Bounds had no right to control the hauling operations; and the Gin had the exclusive right to control the hauling operations.

The trial court concluded that during the time in question: Bounds was not engaged in the transportation of property for hire as contended by the State; Bounds did not transport the Gin's cottonseed for hire in violation of the Act; Bounds did not furnish to the Gin, during the same period of time, both the trucks and drivers for the trucks; Bounds did not assume the characteristic burdens of the transportation business, and the Gin did assume, in significant measure, those burdens; the Gin did not aid or abet Bounds in a violation of the Act; the State is not entitled to recover any penalties from either Bounds or the Gin, and is not entitled to an order enjoining any possible future violation of the Act by either of them.

None of the findings of fact are challenged in this appeal. All of the conclusions of law are attacked on the ground

that the trial court "erred as a matter of law" in so "holding."

The term "motor carrier" is defined in Section 1(g) of the Act as follows:

"The term 'motor carrier' means any person . . ., their lessees, . . . owning, controlling, managing, operating, or causing to be operated any motor-propelled vehicle used in transporting property for compensation or hire over any public highway in this State, where in the course of such transportation a highway between two or more incorporated cities, towns or villages is traversed; . . ."

Section 1(j) of the Act, in pertinent part, reads:

"The term 'transporting property for compensation or hire' shall include the furnishing during the same period of time of equipment and drivers to persons . . ., and their lessees . . ., owning, controlling, managing, operating or causing to be operated any motor-propelled vehicle, . . ."

Section 2 of the Act, in pertinent part, provides:

"No motor carrier . . . shall operate any motor-propelled vehicle for the purpose of transporting or carriage of property for compensation or hire over any public highway in this State except in accordance with the provisions of this Act . . ."

Section 3 of the Act, in pertinent part, provides:

"No motor carrier shall, . . . operate as a common carrier without first having obtained from the (Railroad) Commission, . . . a certificate of public convenience and necessity . . . No motor carrier shall, . . . operate as a contract carrier without first having obtained from the Commission a permit so to do, . . ."

The term "contract carrier" is defined in Section 1(h) of the Act as follows:

"The term 'contract carrier' means any motor carrier as hereinabove defined transporting property for compensation or hire over any highway in this State other than as a common carrier."

In the case at bar, Bounds, when he delivered the trucks to the Gin, lost all control over them for the duration of the leases (120 days from date of each lease). He neither issued nor received any receipts for property hauled or delivered, freight bills, manifests, or any other shipping document of any kind. He did not bill anyone for freight charges, nor did he receive payment from Valley Co-op for any freight charges arising out of the trucking operation. He had no authority to hire any drivers for the leased trucks, nor did he have any control over the drivers who were hired by the Gin, and who were under the exclusive control of the Gin. He assumed no risks, financial, or otherwise, and no responsibilities incidental to the trucking operation during the terms of the leases.

▪ In resolving the issue at hand, we attach no significance to the fact that Bounds, under the lease contracts, was to be compensated for the use of his trucks on a mileage basis and on a different basis under the oral agreement. In either event, the amount was compensation for the use of his trucks, and nothing more. The amount of compensation could not be determined until the leases terminated. That election by Bounds relating to his compensation, without more, could not have any bearing on whether he violated a provision of the Act prior to the date he made such election.

The Act is not concerned with the compensation agreed to be paid the owner of trucks under a lease. It is concerned only with the regulation of motor carriers who transport property belonging to others for compensation or hire over the highways of Texas. One of the requirements is that a copy of the lease, where the property is being transported in leased vehicles, be furnished the Department of Public Safety. Bounds complied with that requirement. Nowhere in the Act is a requirement that the terms and provisions of the lease be approved by either the Railroad Commission, the Department of Public Safety, or any other lawful regulatory agency.

The filing of the oral agreement could have no effect upon the duties, obligations, responsibilities or activities of the Department of Public Safety in its efforts to enforce the provisions of the Act. Compensation for the use of the trucks, or the formula for its determination, was of no concern to the Department. The fact that the option, when exercised by Bounds, resulted in the payment of more money to him than would have been paid had he been compensated on a mileage basis is immaterial to the issues presented in this appeal.

The State argues that under the holding of *State v. Logue*, 376 S.W.2d 567 (Tex.Sup.1964), the Gin could not be held to be a private carrier of its own property since the drivers for the leased trucks were not its *regular* employees, and therefore it necessarily followed that Bounds had to be a motor carrier for compensation or hire, and subject to being regulated by the Act. We do not agree.

The Gin had ten or twelve employees who were employed all of the time. During the ginning season the work force increased to a "little over a hundred" employees. The ninety or more persons who were employed during the ginning season were "regular employees" of the Gin for the season. The drivers for the leased trucks fall into that category. The fact that the wages paid to the drivers of the trucks leased from Bounds were paid by checks which were posted to the "accounts receivable" and not to the "payroll account" did not affect their status as regular employees, despite the State's argument to the contrary. The posting of checks to accounts receivable was no more than a bookkeeping procedure to accurately account for all expenses associated with transporting the cottonseed, which did not determine the status of an employee. We hold that under the peculiar facts of this case, the drivers of the leased trucks were regular employees of the Gin for the ginning season, the period covered by the leases.

The cottonseed was the property of the Gin. The leased trucks and the drivers were under the absolute control of the Gin.

The freight charges were in accordance with the tariffs set by the Railroad Commission. They were paid by Valley Co-op directly to the Gin.

It is conclusively shown by the record that Bounds did not furnish to the Gin, during the same period of time, both the trucks and drivers therefor. The State's argument that the term "furnishing" the drivers must be "construed to include the 'economic' as well as 'physical furnishing of a driver if the legislative plan as to private carriers is not to be circumvented' " is without merit.

During the terms of the leases, all of the burdens of the trucking operations were assumed and borne by the Gin. None were assumed or borne by Bounds. The reimbursement by Bounds to the Gin of all expenditures incidental to the transportation of the cottonseed did not have the effect of imposing any of the burdens on Bounds or relieving the Gin of any such burdens during the time when the cottonseed was being transported. The trial court properly concluded that the Gin assumed in significant measure the burdens of transportation during all times material to the action brought by the State and that Bounds did not assume such burdens.

The State contends that the evidence shows as a matter of law that a violation of the Act was proved; that the provisions of the Act respecting the requirements that the motor carrier possess either a certificate of public convenience and necessity or a permit from the Railroad Commission before transporting property over public highways between two or more incorporated cities could only be enforced against Bounds; and that, under the facts of this case, to hold otherwise would, in effect, permit a violation of the Act by deceit and subterfuge. We disagree.

The State, in support of its position, relies upon *Reavley v. State*, 124 Tex.Cr.R. 528, 63 S.W.2d 709 (1933), and *Berry v. Golden Light Coffee Company*, 160 Tex. 128, 327 S.W.2d 436 (1959). We do not consider either of those cases in point. They are

factually distinguishable from the case at bar.

In the *Reavley* case, the defendant Reavley leased a truck to Armour & Co. for the purpose of transporting the lessee's products over public highways. He was paid a compensation of $60.00 per week. He employed the driver, paid his wages and all other expenses of operation. He obligated himself to furnish another truck in the event of a breakdown of the truck under lease. The driver collected all charges, and Reavley was responsible to Armour & Co. for the prompt remittance of all such collections. Reavley further agreed to save Armour & Co., the lessee, harmless from any claim made by the driver under compensation laws in the event of injury to the driver. The Court held that he was a contract carrier for hire and a permit was required. In the *Reavley* case, the control of the trucking operation was in Reavley; here the control was in the Gin.

In the *Berry* case, Cunningham leased a truck to Golden Light Coffee Co. for the purpose of transporting coffee for the latter. Cunningham had a permit to transport other commodities, but did not possess a permit to transport coffee. The drivers of the trucks were employees of Cunningham and were under his control. Labels were painted on the truck which indicated that the truck was owned and operated by Golden Light. The drivers were instructed to and, upon occasion, did inform law enforcement officers that the truck was owned by Golden Light and that they were its employees. Golden Light was not in an economic position to operate its own trucks. The Court held that for the purpose of securing the transportation of its coffee, Golden Light, in effect, represented that it was transporting its own property, and that the contract was entered into for the deliberate purpose of circumventing the Act by making it appear that the trucks actually owned by Cunningham and operated by him were the property of Golden Light. In the *Berry* case, damages were sought for an injury received in an automobile-truck collision (where the truck was being driven by one of Cunningham's employees) against the lessee on the ground that it and not the lessor was in fact the transportation operator. Here, enforcement of the Act is sought against the lessor of the trucks, not the lessee. Moreover, it is conclusively shown that the Gin was in an economic position to operate its own trucks during the 1976 ginning season had it elected to do so. There is absolutely no evidence of any attempt by the Gin or Bounds to inform law enforcement officials that the trucks were owned by the Gin, or that the drivers were not employed by it. There is nothing which remotely suggests that the arrangement was a guise for the purpose of deceiving anyone as to the true nature of the business arrangement. The leases are fairly susceptible of the construction that the trucks were to be used exclusively in the prosecution of the Gin's business by hauling the Gin's cottonseed to its purchaser. No better means could be devised to evidence such purpose than by filing copies of the leases with the Department of Public Safety which showed on their faces the terms of the leases including the fact that the lawful right to control the trucks under lease was vested in the Gin, the lessee, who also had the exclusive right to employ and control the drivers of the trucks.

■ We hold that Bounds was not a motor carrier as defined by the Act, that is, he was not engaged either in controlling, operating or causing to be operated motor-propelled vehicles used in transporting property for compensation or hire over the public highways of this State. The trial court correctly concluded that Bounds did not violate "Art. 911b, V.A.C.S." *Cobb v. Harrington*, 144 Tex. 360, 190 S.W.2d 709 (1945); *Farmers' Gin Co-op Ass'n v. Mitchell*, 233 S.W.2d 948 (Tex.Civ.App.—El Paso 1950, no writ).

■ Having held that Bounds was not in violation of the Act, it necessarily follows that the Gin could not have aided and abetted him in a violation thereof. However, we discuss the argument made by the State in support of its contention that the Gin, by aiding and abetting Bounds, violated the

Act. It argues that the failure to file a written memorandum of the oral agreement with the Department of Public Safety was deliberate, and that such failure "was to leave the illusion" with the Department of Public Safety that Bounds would be compensated solely on a per mile of use, which enabled the Gin to continue "to maintain the on-paper illusion of a private carriage operation." The State also says that "the transactions were structured to mask their nature," with the end result that the Gin "received, for all practical purposes, all of the advantages of a certificated for-hire transportation service," without assuming any of the burdens and risks of the trucking operation, and that the Gin acted "as a mere conduit to funnel the revenues collected from Valley Co-op and the total expenses of the truck operation, including drivers wages, to Tom Bounds." We disagree.

The record will not sustain the State's contention that, as a matter of law, the Gin aided and abetted Bounds in acting as a motor carrier in violation of the Act. The trial court did not err in concluding that the Gin did not aid and abet Bounds in any violation of the Act.

We have read the record in its entirety. The evidence amply supports the trial court's findings of fact. We find no reversible error in either the trial court's conclusions of law or in its judgment. We have considered all of the points of error which have been brought forward by the State. All points are overruled.