## INTERSTATE COMMERCE COMMISSION
## v. PICKARD et al.
### Civil Action No. 642.

District Court, W. D. New York.

Nov. 28, 1941.

George L. Grobe, U. S. Atty., and Robert M. Hitchcock, Asst. U. S. Atty., both of Buffalo, N. Y., for plaintiff.

Jack Garrett Scott, of Washington, D. C., Asa J. Merrill, of New York City, and Gregory U. Harmon, of Washington, D. C., for Interstate Commerce Commission.

Rogerson, Clary & Hewes, of Jamestown, N. Y., for defendants.

KNIGHT, District Judge.

This suit is brought under Section 222 (b) of Part II of the Interstate Commerce Act, 49 U.S.C.A. § 322(b), to restrain the defendants, George C. Pickard and Bennie M. Anderson, from operating as motor carriers without authority of law. The plaintiff also seeks to restrain the Jamestown Sterling Corporation from employing said motor carriers in transportation involving such unlawful operations.

The complaint sets out three causes of action: (1) Charging the defendants Pic-

kard and Anderson, individually and as copartners, in engaging in the transportation of property by motor vehicle in interstate commerce in violation of law; (2) with having failed and neglected to file a tariff of rates, etc., and operating without such filing; and (3). with transportation of property in interstate commerce without having filed security for the protection of the public as provided by law.

Part II of the Interstate Commerce Act became effective October 1, 1935, 49 U.S. C.A. § 301 et seq. Up to September 18, 1940, it was known as "The Motor Carrier Act." This act vests the regulation of transportation of property by motor carrier engaged in interstate commerce in the Interstate Commerce Commission. By its provision a common carrier is prohibited from engaging in interstate commerce unless he has a certificate of public convenience and necessity issued by the Interstate Commerce Commission. It is also the duty of the common carrier to enforce reasonable rates and charges for transportation and file with the Commission a tariff showing the rates charged. The law also authorized the Commission to prescribe rules requiring the common carrier to file a policy of insurance for the protection of the public and shipper. The Act of September 18, 1940, c. 722, Title I, Sec. 1, 54 Stat. 899, 49 U.S.C.A. chs. 1, 8, 12 notes, amended the Interstate Commerce Act in certain respects. The amendment recites the purpose of the statute to be "to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense."

Part II of the Interstate Commerce Act, 49 U.S.C.A., Chapter 8, as amended September 18, 1940, reads:

"Sec. [§] 303. Definitions and exceptions

"(a) Definitions

* * *

"(14) The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or * * * for compensation, * * *" and

"(17) The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

"(15) The term 'contract carrier by motor vehicle' means any person which, under individual contracts or agreements, engages in the transportation (other than transportation referred to in paragraph (14) and the exception therein) by motor vehicle of passengers or property in interstate * * * commerce * * *."

The Safety Rules of the Commission, Part V, 5(a), provide that each carrier shall carry a driver's log to be kept by every driver employed in operating motor vehicle in interstate commerce showing the details therein set forth.

The defendants George C. Pickard and Bennie M. Anderson are co-partners, in business in the city of Jamestown, New York. As such co-partners they own and operate one tractor and trailer, and the only business of the partnership has been the operation of this tractor and trailer for the defendant Jamestown Sterling Corporation, which is engaged in the manufacture and sale of furniture in said city. On September 9, 1938, the defendants George C. Pickard and Bennie M. Anderson entered into a written agreement with the Jamestown Sterling Corporation pursuant to which they purported to lease the aforesaid truck and trailer to said corporation at a monthly rental of $1,000 for the period of one year. Subsequent agreements to the same effect were executed on September 9, 1939, and September 9, 1940. These provided that the partners furnish motor fuel and oil, but in the event the cost thereof were more or less than $200 per month, proper allowance would be made for the excess or deficiency. It further provided that the partners were to provide two employees to operate the truck, and these were to remain their employees for "every purpose whatsoever." The partnership was to furnish compensation insurance, pay social security and other similar contributions or payroll deductions. They were to procure licenses and carry insurance protecting the Jamestown Sterling Company from damage from injuries to person or property or other cargo transported.

Defendant Jamestown Sterling Corporation prior to 1938 had delivered its furniture to common carriers for transportation into various states. Two separate common carrier lines, each of which was operated by each of the defendants Pickard and Anderson, prior to 1938, were included among such common carriers. There were certain territorial limits to their authority as common carriers and hence defendants Pickard and Anderson were not then able to make deliveries to consignees in places outside their operating authority. This led to the engagement in the partnership aforesaid, the sole purpose of the formation of which was to furnish a single truck and trailer for the delivery of furniture for the defendant Jamestown Sterling Corporation to such outside places.

It is conceded that neither the partnership nor the defendant Jamestown Sterling Corporation had authority to operate in interstate commerce as a motor common carrier or contract carrier and that no schedule rates had been filed with the commission and that neither had complied with any commission rules or regulations, save the furnishing of drivers' daily logs.

The practice under the lease was substantially this: The furniture was loaded at the corporation's plant. The driver of the truck was given duplicate invoices of the shipment. On delivery the consignee retained one and receipted the other. This receipted invoice was returned to the corporation, and the corporation charged and billed the consignee for transportation. Attached to the aforesaid invoice was a slip on which was printed the following: "In order to render good service and facilitate shipments to our customers in certain districts not served by our regular carriers, we have leased a truck for our exclusive use so that it is necessary that this shipment be billed to you F.O.B. your warehouse, freight allowed. Under this procedure all risk incidental to transportation on your part is eliminated and we ask your co-operation." The receipts from such transportation were deposited by the corporation in a bank where it had no other account, and the corporation kept two separate book accounts of such receipts; one was nominated "list of loads"; the other was kept as a journal and ledger account, and this also showed the payments to the partnership. All the payments to Pickard and Anderson on account of this lease were made from this special account.

The Motor Carrier Act of 1935 defined a "common carrier" as a person who transported passengers or property "for the general public in interstate * * * commerce by motor vehicle for compensation, * * *." It will be noted that the amended Act is made applicable to any "person which holds itself out to the general public to engage in the transportation by motor vehicle, * * *." The plaintiff takes the position that the partnership was a "common carrier" and obviously bases this upon the contention that the partnership held itself out to the general public as engaging in interstate transportation by virtue of the alleged delivery by it to various parties in different states. In the view which is taken here it is not necessary to determine whether the partnership was a common carrier or a contract carrier.

It is pertinent to consider the declaration of policy as set forth in the Motor Carrier Act. This includes the policy to provide for "fair and impartial regulation of all modes of transportation subject to the provisions of this Act, * * * to promote * * * efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences, or advantages, or unfair or destructive competitive practices."

The methods here employed could result in "unjust discriminations, undue preferences or advantages" as between the partnership and other carriers. Of course, a private carrier could fix its own rates of transportation, but the effect of acts should be considered in connection with the proofs going to show the commission of such acts.

It is my conclusion that the government is entitled to injunctive relief. Succintly stated the major facts, as believed, establishing that this partnership was and is transporting goods in interstate commerce for compensation in violation of the Motor Carrier Act are: The partnership housed the truck without charge, kept it in repair, furnished gas and oil, provided drivers and paid their wages. The partnership was required to maintain the vehicle in proper working condition and substitute another in case of break-down. Logs were kept by the drivers and returned to the partners. It agreed to procure the license for the truck, to secure workmen's

compensation insurance, to pay social security taxes and similar payments with respect to the drivers. It agreed to procure insurance protecting the corporation from damages to person or property through operation of the truck. Further, it is significant that while the so-called "sticker" or slip attached to the invoices contained the words "freight allowed," the freight was not allowed. The payments for freight were put in a separate account and kept in two separate books of account. Since we have here what purports to be a straight lease of a truck and the payment of a specified sum for it, there was no reason why this freight account should not have been carried solely in the ledger account of the corporation. The freight charges approximated the tariff rate for the shipment made. The payments upon the lease were not made in the amounts and at the times specified in the lease. The amounts so paid varied from time to time, and all of the receipts from transportation were paid from the special deposit account to the partnership, save two small items asserted to be on account of damaged claims. The amounts paid on the lease are much less than the amount due under the terms of the lease. The amount paid for the truck was $2,800. The rent fixed is disproportionate. It is true that the lease emphasized the position of the corporation as an independent contractor. Such characterization, however, can not preclude the showing that the corporation was not an independent contractor or private carrier, or, in other words, that it occupies another relationship.

We do not question the sincerity of purpose of the parties in making this lease. We do not question that they believed that by this means the corporation became a private carrier and not subject to the provisions of the Motor Carrier Act. We believe that their efforts were honestly made, but we also believe that the purpose sought was not accomplished.

There are a number of cases that are in point on the question here involved. While some of these arose under state statutes differing somewhat in language from that of the Motor Carrier Act, the difference is not such as makes them inapplicable as authorities here. Among these are: United States v. Steffke, D.C., 36 F.Supp. 257; Georgia Truck System, Inc., v. Interstate Commerce Commission, 5 Cir., 123 F.2d 210, decided Nov. 4, 1941; Reavley v. State, 124 Tex.Cr.R. 528, 63 S.W.2d 709; Holmes v. Railroad Commission of Cal., 197 Cal. 627, 242 P. 486; Columbia Terms. Co. Contract Carrier Application, 18 Motor Carrier Cases 662.

It has been urged by the government that, assuming that the partnership is not a common carrier or a contract carrier, the corporation is a common carrier. The determination hereinbefore made precludes the finding that the corporation is a common carrier. Further than that the issue as to this can not be raised in this suit now. It is not alleged in the complaint.

It is the view of this court that the partners were common carriers in interstate commerce, by motor vehicle, for compensation.

Findings may be submitted to be taken as a part of the decision herein.