BROOKS TRANSP. CO., Inc., et al. v.
UNITED STATES et al.

Clv. A. No. 1149.

United States District Court
E. D. Virginia.

Argued Sept. 22, 1950.

Decided Oct. 9, 1950.

Jack Garrett Scott, Washington, D. C., John T. Grigsby, Richmond, Va., Francis E. Barrett, Boston, Mass., Walter L. Baumgartner, Washington, D. C., for plaintiff. ..

Jack Garrett Scott, Washington, D. C., John T. Grigsby, Richmond, Va., Robert J. McBride, Washington, D. C., Albert B. Rosenbaum, Washington, D. C., for intervener.

Herbert A. Bergson, Asst. Atty. Gen., James E. Kilday, Lambert S. O'Malley, Sp. Assts. to Atty. Gen., George R. Humrickhouse, U. S. Atty., and Richard E. Lewis, Asst. U. S. Atty., Richmond, Va., John Ford Beacher, Washington, D. C., for United States.

Tucker, Mays, Cabell & Moore, Richmond, Va., Fate J. Beal, Lenoir, N. C., for Lenoir Chair Co.

Tucker, Mays, Cabell & Moore, Richmond, Va., Walter, Burchmore & Belnap, Chicago, Ill., for National Industrial Traffic League, Intervener.

Tucker, Mays, Cabell & Moore, Richmond, Va., Chadbourne, Wallace, Parke & Whiteside, New York City, for Schenley Industries, Inc.

Tucker, Mays, Cabell & Moore, Richmond, Va., Dow, Lohnes & Albertson, Washington, D. C., for Private Carrier Conference of American Trucking Ass'n, Inc.

Tucker, Mays, Cabell & Moore, Richmond, Va., William A. Quinlan, Washington, D. C., for National Council of Private Motor Truck Owners, Inc..

Daniel W. Knowlton, Chief Counsel, Edward M. Reidy, Associate Chief Counsel, and Samuel R. Howell, all of Washington, D. C., for Interstate Commerce Commission.

Before DOBIE, Circuit Judge, HUTCHESON, Chief Judge, and BRYAN, District Judge.

DOBIE, Circuit Judge.

This is a suit to enjoin, vacate, and set aside orders of the Interstate Commerce Commission, dated May 27, 1948, and June 21, 1948. The order of May 27, 1948, was entered in the Commission proceeding entitled Lenoir Chair Company Contract Carrier Application, Docket No. MC 96541, and the order of June 21, 1948, was entered in Schenley Distillers Corporation Contract Carrier Application, Docket No. MC-107079.

By application filed with the Commission on March 25, 1946, Lenoir Chair Company of Lenoir, North Carolina (hereinafter referred to an Lenoir), sought a permit authorizing continuance of operation as a contract carrier by motor vehicle, over irregular routes, in interstate or foreign commerce for the transportation of furniture of its own manufacture and of materials, supplies, and machinery used, or to be used, in the manufacture of furniture, throughout a territory embracing all points in fifteen States and the District of Columbia. The application alleged that the motor vehicle operations involved were not those of a common or contract carrier but constituted private carriage only, and in order to secure a determination of

this question by the Commission, it requested that the application be dismissed for want of jurisdiction, otherwise that it be granted a permit to engage in the operations described in the application. This is a correct method of securing a determination of its status. Schenley Distillers Corp. v. United States, 326 U.S. 432, 66 S. Ct. 247, 90 L.Ed. 181.

The application was assigned for hearing before an examiner of the Commission and hearing was held September 19, 1946. The evidence submitted by applicant related solely to the question of applicant's status. On December 23, 1946, the report recommended by the examiner was served on the parties to the proceedings. This report contained a finding that the applicant's operations were those of a private carrier and recommended that an order be entered dismissing the application. Thereafter, on February 11, 1947, exceptions were filed to the examiner's proposed report and recommended order by certain protestants and interveners and following replies to the exceptions by applicant and certain other interveners the Commission by Division 5, on May 27, 1948, issued its report in which the conclusion was reached that applicant was not a common carrier or a contract carrier but was a private carrier.

Schenley Distillers Corporation (hereinafter referred to as Schenley) filed its application with the Commission May 7, 1946, seeking a permit to operate in interstate or foreign commerce as a contract carrier by motor vehicle over irregular routes in the transportation of alcoholic liquors of its own manufacture or that of its subsidiaries, and of materials and supplies used in their manufacture and sale throughout a territory including all points in fourteen States and the District of Columbia. The application alleged that the operations involved were those of private carriage and not common or contract carriage and requested the Commission to dismiss the application. The purpose of the application, just as that filed by Lenoir, was to secure a determination of the applicant's status with respect to whether it was a private carrier or a common or contract carrier.

The application was heard by an examiner of the Commission on September 5, 1946, at which evidence was introduced by applicant which related only to its status. On March 11, 1947, the report recommended by two Commission examiners was served containing a finding that the proposed operation by the applicant was that of a contract carrier by motor vehicle and not that of a private carrier. They further found that applicant had failed to establish that the operations involved would be consistent with the public interest and the National Transportation Policy and recommended that an order be entered denying the application. Thereafter, on March 14, 1947, exceptions were filed to the examiner's proposed report and recommended order by applicant and an intervener to which replies were duly filed by certain intervening protestants. On June 21, 1948, the Commission, by Division 5, issued its report which contained conclusions differing from those recommended by the examiners. In its report Division 5 (one of its three members dissenting) found that applicant's operations were not those of a common or contract carrier by motor vehicle as defined by the Act and dismissed the application. This finding, it will be observed, had the effect of holding that applicant was a private carrier.

Being dissatisfied with the decision of Division 5, certain intervening protestants, including some of the intervening plaintiffs herein, filed petitions in both the Lenoir and Schenley proceedings requesting reconsideration by the entire Commission and oral argument. By order dated January 3, 1949, the Commission reopened both proceedings for oral argument and denied the petitions in all other respects. Since the proceedings in each case presented similar issues, the applications of both Lenoir and Schenley were heard together on oral argument before the entire Commission on April 21, 1949, and were disposed of in one report. Following the oral argument and after careful and thorough consideration of the issues involved, the Commission (one Commissioner dissenting and two others necessarily absent and not participating in the proceeding) found that both

Lenoir and Schenley were not common or contract carriers by motor vehicle as defined by the Act, and that the applications should be dismissed. In view of the fact that the prior orders of Division 5 dismissing the applications were not vacated or set aside and remained in full force and effect, no further order was entered in either proceeding.

After these findings by the entire Commission, this suit was brought to enjoin and set aside the orders of Division 5 which held Lenoir and Schenley to be private carriers.

The facts in the case are not in dispute. The only question involved is one of law, namely, did the Commission err in finding that Lenoir and Schenley were not common carriers as defined in Part II of the Interstate Commerce Act, hereinafter called the Act, Section 203(a)(14), or contract carriers as defined in Section 203(a)(15), but private carriers as that term is defined in Section 203(a)(17) of the Act, 49 U.S.C.A. § 303(a)(14), (15) and (17).

The pertinent provisions of the statute involved in this case are found in Section 203(a) which provide that as used in Part II of the Interstate Commerce Act:

"(14) The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes, * * *

"(15) The term 'contract carrier by motor vehicle' means any person which, under individual contracts or agreements, engages in the transportation (other than transportation referred to in paragraph (14) and the exception therein) by motor vehicle of passengers or property in interstate or foreign commerce for compensation.

* * * * * *

"(17) The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

The facts as to Lenoir and Schenley, as found by Division 5, may be briefly summarized: Lenoir operates five trucks in long-distance hauling and six or seven trucks in interplant service. It transports furniture from its plants to customers in the States named in the application, and whenever possible these vehicles are loaded on return with commodities used by applicant in its plants. Apparently at one time it did haul commodities for others, that is, persons other than itself or its customers, but this practice was discontinued some years ago, and applicant now transports and desires to transport out-bound, in interstate or foreign commerce, only its finished furniture to its customers and inbound only supplies used by it in its factories. Of its total annual production, approximately $3,000,000, only between fifteen and twenty percent has been transported in its own trucks, the balance being transported by rail and motor common carriers. Its sales are made f. o. b. its factories. When it delivers furniture in its own vehicles it adds to this factory price a charge comparable to the charges of rail or motor carriers who are also used to the same destinations, and shows this figure separately on the invoice. This is done in order that the delivery price at destination will be the same whether the furniture moves in applicant's vehicles or is transported by a carrier for hire and also "so as not to be unfair competition to any other carrier." Supplies and materials used by applicant are usually purchased f. o. b. origin, although sometimes a freight allowance is made by the supplier.

For some years Lenoir has maintained an account which reflects the income and expenses incurred in the operation of its trucks. Its representative was not certain how this account reflected transportation performed by its own vehicles when supplies are purchased f. o. b. origin. Where a freight allowance is granted, however,

this amount is shown. On out-bound shipments, the amount collected, equal to the motor or rail rate, is shown. During the last six months of 1945 this account showed an income of $15,412.76 and expenses of $21,935.89, or a loss of $6,523.13. The total miles traveled during this period was 102,350. Total income for the first six months of 1946 was $13,461.33, and total expenses were $25,684.25, or a loss of $12,222.92. The total distance traveled in this period was 102,670 miles.

In many instances Lenoir's vehicles return empty to its plants. Thus the possibility of a return haul influences to some extent Lenoir's determination whether it will use its own vehicles for the out-bound transportation of its furniture to particular destinations. It is claimed, however, that this consideration is not absolutely controlling because considerations such as the needs of the customers, the availability of for-hire carriers, the expedition of delivery and good will are also given weight. Lenoir does not hold itself out to the general public or to anyone as a common carrier by motor vehicle. Neither are its services available to anyone as a contract carrier by motor vehicle under individual agreements or contracts. It desires only to continue the business of transporting its own manufactured products to its customers and to return to its plants supplies and materials used by it in its furniture manufacturing business.

Schenley now owns thirty-two tractors, thirty-one semi-trailers, and one service truck. It rents garage facilities at Lawrenceburg near the distillery of one of its subsidiary corporations, Schenley Distillers, Inc. At Lawrenceburg, it employs drivers and mechanics, and also a transportation engineer who superintends and manages the motor operations. At the time of the hearing herein in September, 1946, its motor operations were confined to service to and from the Lawrenceburg distillery of Schenley Distillers, Inc. However, Schenley intends to operate to and from other of its subsidiary corporations.

In 1945 the motor vehicles then owned by Schenley Motor transported less than 0.05 percent of all shipments moving to and from three of applicant's subsidiary corporations. While this record does not disclose the present percentage of traffic handled by Schenley's vehicles, apparently it is substantially the same as that in 1945.

Schenley purchases and takes title to the entire output of case liquors of its subsidiary corporations at the distilleries. All out-bound transportation performed by Schenley's vehicles consists of the movement of packaged liquor sold by Schenley to various purchasers.

When packaged liquor sold by Schenley is transported to the purchaser by rail and motor common carriers, it is sold f. o. b. point of origin. However, when it moves in Schenley's vehicles, it is sold f. o. b. destination. The price of packaged goods delivered directly to the purchaser in Schenley's vehicles is the selling price at origin plus a sum roughly equivalent to the rail rate from origin to destination. Thus a uniform delivery price is maintained in all instances regardless of the method of transportation utilized by the customer.

All expenses incurred in the operation of its vehicles including repairs, the wages of drivers, mechanics and other of its employees, are paid by Schenley and accounted for in its books. Claims for loss and damage of packaged liquor are filed with and, if warranted, paid by Schenley. Should a purchaser file a loss or damage claim with one of Schenley's subsidiary corporations, it would be forwarded to Schenley for investigation and adjustment.

When Schenley's vehicles are utilized for the described out-bound service, no bills of lading are issued nor is any contract of transportation entered into between Schenley and any other party. Information with respect to origin, destination, consignee, and weight is recorded on what is known as a "Schenley Affiliates Trip Sheet" by the traffic department of the particular subsidiary corporation which distilled the liquor. Eight copies of this trip sheet are made, but nowhere thereon is there any stated or segregated amount for transportation. The traffic managers of Schenley's subsidiaries, while not employees of Schenley, are under

the supervision of Schenley's general traffic manager.

All distillery supplies such as bottles, labels, corks, acids, soda ash, corn steep liquor, caramel, and concentrates, are purchased f. o. b. point of origin apparently by Schenley's subsidiary corporations. Schenley's vehicles handle an occasional in-bound movement of these distillery supplies at the request of the traffic manager of the particular subsidiary corporation. As stated, the traffic manager of the various subsidiary corporations are not employees of Schenley but are under the supervision of Schenley's general traffic manager. None of the expenses incurred in the operation of Schenley's vehicles even in this in-bound service is charged against any of its subsidiary corporations. When these in-bound supplies reach the subsidiary corporation, they are carried in its inventory. As is the case with all out-bound transportation, no bills of lading are issued nor is any contract of transportation entered into between Schenley and any other party, but all pertinent information is listed on a "Schenley Affiliates Trip Sheet".

■ We think the Commission's interpretation of the Act, and its holding that both Lenoir and Schenley are private carriers, is correct on the score of reason and authority and in the light of the history and manifest purposes of the Act. The injunction sought by plaintiffs must, therefore, be denied and their civil action must be dismissed.

■ The Commission, in deciding that Lenoir and Schenley were private carriers, as opposed to contract carriers or common carriers, applied what is known as *the primary business test*. In other words, if it is established that the primary business of a concern is the manufacture or sale of goods which the owner transports in furtherance of that business and the transportation is merely incidental thereto, the carriage of such goods from the factory or other place of business to the customer is private carriage even though a charge for transportation is included in the selling price or is added thereto as a separate item. The Commission has so held consistently in its interpretation of the statutory provisions regulating the various categories of motor carriers. See, Congoleum-Nairn, Inc., Common Carrier Application, 2 M.C.C. 237; D. L. Wartena, Inc., Common Carrier Application, 4 M.C.C. 619; Swanson Contract Carrier Application, 12 M.C.C. 516; Murphy Common Carrier Application, 21 M.C.C. 54; Dull Contract Carrier Application, 32 M.C.C. 158; Woitishek Common Carrier Application, 42 M.C.C. 193.

In the Woitishek case (discussed at length in all the briefs before us), the primary business test, as a criterion for distinguishing between (on the one hand) private carriers and (on the other hand) contract and common carriers, was carefully reexamined and reanalyzed by the Commission, and the conclusion was reached: "After careful reconsideration of the entire subject, * * * that we should continue as in the past to determine all issues of for-hire versus private carriage on the basis of the operator's primary business."

■ Though the question here involved is one of law, it is well settled that the courts should give great weight to the Commission's interpretation of the Act. Thus, in Levinson v. Spector Motor Co., 330 U.S. 649, 672, 67 S.Ct. 931, 943, 91 L.Ed. 1158, Mr. Justice Burton said: "As conclusions of law, these do not have the same claim to finality as do the findings of fact made by the Commission. However, in the light of the Commission's long record of practical experience with this subject and its responsibility for the administration and enforcement of this law, these conclusions are entitled to special consideration." See, also, United States v. American Trucking Association, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; Colgate-Palmolive-Peet Co. v. United States, 320 U.S. 422, 426, 64 S.Ct. 227, 88 L.Ed. 143; McLean Trucking Co. v. United States, 321 U.S. 67, 87–89, 64 S.Ct. 370, 88 L.Ed. 544; Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796.

It might be well to emphasize at this point that in the instant case both Lenoir and Schenley transport in their own motor vehicles property which they (or, in the case of

Schenley, its subsidiaries) manufacture and own at the time the transportation services are performed. They carry for no one else and do not hold themselves out to do so. The goods transported are for sale and in furtherance of their primary business of manufacturing. While a charge for transportation is either included in the sales price of their goods or is added to the selling price as a separate item, in either event no charge is made for the transportation as such. Neither company is primarily engaged in the transportation business. The facts show that they transport only a very small percentage of their total products, and that the cost of the transportation exceeds the revenue derived therefrom. Measured by the test contained in the statute, the Commission, we think, has found correctly that neither Lenoir nor Schenley is either a contract carrier or a common carrier, but each is a private carrier.

The Commission's application of the primary business test as a criterion for distinguishing between common and contract carriers on the one hand and private carriers on the other hand, has been quite generally upheld by the courts. In Interstate Commerce Commission v. Clayton, 10 Cir., 127 F.2d 967, 969, Circuit Judge Phillips stated:

"He does not hold himself out to the general public to haul coal for compensation. He does not haul coal for compensation to fill particular orders or under individual contracts or agreements. He has indulged in no subterfuge or design to avoid the requirements of Part II of the Interstate Commerce Act. The cost of the coal and transportation is $5.57 per ton. He sells it for $8.50 per ton. Thus he realizes a profit, both from the transportation and from the sale of the coal, the margin of profit being large enough to cover both.

"We conclude he is engaged in the bona fide coal business; that he transports coal of which he is the owner for the purpose of subsequent sale and in furtherance of a commercial enterprise; and that the trial court was warranted in finding that he is a private carrier."

In Interstate Commerce Commission v. Tank Car Oil Corporation, 5 Cir., 151 F.2d 834, 837, Circuit Judge Waller said: "We think that Congress not only intended to say, but said, that if a person, in good faith, transports his own property for the purpose of sale or in furtherance of his own commercial enterprise he is a private carrier and, therefore, is not subject to the provisions of the Act."

Again, Circuit Judge Collet remarked, in Beggs v. Kroger Co., 8 Cir., 167 F.2d 700, 702-703: "The defendant was not a common carrier or a contract carrier, but it was a private carrier of property by motor vehicle if defendant was engaged in the transportation of goods in interstate commerce for the purpose of sale or in furtherance of any commercial enterprise."

In A. W. Stickle & Co. v. Interstate Commerce Commission, 10 Cir., 128 F.2d 155, 160-161, certiorari denied 317 U.S. 707, 63 S.Ct. 154, 87 L.Ed. 564, where the factual pattern warranted a different conclusion, Circuit Judge Phillips was careful to point out: "The transportation is not merely incidental to the business of selling lumber. It is a major enterprise in and of itself. The major portion of Stickle & Company's capital investment is in that enterprise, and the major portion of its payroll goes to employees engaged in that enterprise." And see the dissenting opinion of Circuit Judge Huxman in this case.

Opposed to these cases is Interstate Commerce Commission v. Jamestown Sterling Corporation, D.C., 64 F.Supp. 121, decided by a single District Judge. And, cf. Interstate Commerce Commission v. Pickard, D.C., 42 F.Supp. 351. In Schenley Distillers Corporation v. United States, D.C., 61 F.Supp. 981, 988, affirmed 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181, a subsidiary corporation engaged solely in transporting for its parent corporation and other subsidiaries was held to be a contract carrier, but Circuit Judge Maris was careful to note:

"In each of these as well as many others cited in which it was necessary to determine whether the carriage was for hire or was private carriage it was found helpful

to determine whether the primary business was the supplying of transportation or whether the transportation was merely incidental. The problem there requiring solution does not concern us since in this case it is undisputed that the primary and indeed sole business of Motor Division is that of transportation."

Counsel for plaintiffs here point out that under the statutory definitions one is a private carrier only if one is "not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle.' " This is true, and equally true is it that the term "compensation" is found only in the statutory definitions of common carrier and contract carrier, not in the definition of private carrier. But it does not follow, as plaintiffs contend, that wherever compensation, direct or indirect, is found, the carrier is (with only those exceptions made express in the Act) a common carrier or a contract carrier.

Plaintiffs are here attributing to the term "compensation" a mystical significance which the term does not possess. There are fallacies in this contention even if resort be had, as plaintiffs wish, to mere mechanical logic and a purely analytical interpretation of the terms used in the statutory definitions. Thus, the clause "when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise" appears (a) in the definition of private carrier, but not (b) in the other two definitions, common carrier and contract carrier. Accordingly, by this same logic, the basic difference between (on the one hand) common carriers and contract carriers and (on the other hand) private carriers, is whether or not the "transportation is for the purpose of sales, lease, rent or bailment, or in furtherance of any commercial enterprise." Possibly, this confused thinking of plaintiffs may be due somewhat to the fact that at common law, the common carrier of goods must carry for a compensation. See, Dobie, Bailments and Carriers, 296, 300, 304.

The history of the Act, we think, completely demolishes the validity of plaintiff's *compensation* criterion and supports the Commission's criterion of *Primary business purpose*. In the "Hearings before the Committee on Interstate Commerce, United States Senate, 74th Congress, 1st Session on S. 1629" (Government Printing Office, Washington, 1935), page 86, the late Commissioner Joseph B. Eastman testified as follows in response to questions asked by Senators Hastings and Wheeler (as to whether the proposed bill to regulate motor carriers would regulate the transportation by owners of their own goods being transported to their customers):

"Well, I was going to say that in instances where the trucker actually buys the products which he transports, if that is a bona fide transaction and not merely a device to evade regulation, he would be a private carrier."

Representative Holmes, in explaining the provisions of the Act to Members of the House, said: "In other words, the department stores in Washington that may sell a bill of goods to be delivered in Philadelphia, New Jersey, or Massachusetts, do not come under the provisions of this bill because they are private owners of motor vehicles."

Again, during the debate on the Act, Senator Wheeler pointed out: "The definition of 'private carrier of property by motor vehicle' is transferred by the Committee from a later section and applies to persons transporting their own goods in their own vehicles for commercial purposes. The only regulation to which such carriers are subjected is that with respect to the maximum hours of service and qualifications of employees and the safety of operation and equipment—section 204(a) (3)."

To like effect is the statement of Senator Reed: "I think the time may come when we shall have to regulate the transportation of private property by the owner of such property when it is transported for commercial purposes. But I fully concur in the statement of the chairman of the committee that there is nothing in the bill which undertakes to do it."

Again, note the dialogue between Senators McKellar and Wheeler:

Mr. McKellar: "To use the illustration I gave a while ago, if a private concern in

Memphis, Tenn., desires to deliver its goods to the South, in Mississippi, or to the West, in Arkansas, it may do so without coming within the provisions of the bill?"

Mr. Wheeler: "Exactly. The most attempted to be done—that has not been done—is to try to regulate the safety conditions. There is a provision in the old law, which remains the same with respect to safety provisions."

Finally, in this connection, it may be noted that, by a vote of 54 to 21, the Senate rejected the so-called Shipstead Amendment. Senator Shipstead proposed to add to the bill S. 2009 a clause amending the Federal Trade Commission Act to make it a violation of law "for any person, partnership or corporation to so fix the price at destination of any goods or commodities transported in commerce, that such price includes a charge for transportation, based upon railroad rates, for any part of the transportation of such goods or commodities which was not conducted by railroad." Congress also rejected the so-called Miller-Wadsworth amendment in favor of the *compensation test.* Nor has Congress, evidently quite aware of the consistent practice of the Commission in applying the *primary business test* in determining the statutory status of carriers, ever amended the Act so as to negative this practice. If the *compensation test* should be rigidly applied, it is not difficult to foretell the vast volume of cases which would thereby be cast on the already heavily burdened Interstate Commerce Commission.

We deem it not inappropriate to consider what might be called the economic approach to the problem before us, in the light of what might be called the felt needs and the best interest of the interstate carriers of goods by motor vehicle. In our considered judgment, such an approach strongly favors the *primary business test* as against the *compensation test.* And the problem before us is preeminently one that should be solved not by theoretical abstractions or by excursions into juristic semantics but rather by practical common-sense. Just what type or measure of compensation was intended by Congress to bring the car-

riage within Section 203(a) (14) or (15) is best ascertained by the *primary business test.* And, in the application of this test, the motive to profit by the carriage and the relation of the carriage to the business involved are important elements.

Though the point was not stressed by counsel for plaintiffs, either in the briefs or in oral argument, we think it well to state that we see nothing in the instant case even tending to show that Schenley is attempting by subterfuge to evade the impact of the decision in Schenley Distillers Corporation v. United States, D.C., 61 F.Supp. 981, affirmed in 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181.

In considering the reasons why commercial concerns, such as stores or factories, having goods for sale, should resort to transporting them in their own motor vehicles, the Commission stated (Sheet 12, Exhibit G to the Complaint herein): "It is recognized that there are a number of very good reasons, apart from a desire to set up a separate business for profit, which prompt mercantile, or commercial concerns to conduct all or a portion of their own motor operations rather than to rely upon the services of for-hire carriers. Not the least among these reasons is the matter of good will fostered by the prompt and efficient delivery of rush orders to customers. Other advantages accruing to a private carrier flow from its absolute control over, and exclusive use of, the motor equipment assuring (1) the absence of congestion at loading docks, (2) the safe arrival of goods not mixed with goods of other shippers and not exposed to extra or inexperienced handling, and (3) on-time deliveries of finished goods at customers' doors and of raw materials and supplies at its plant. The use of its own equipment also enables a private carrier to avoid expensive packaging sometimes necessary when shipment is by motor common carriers."

The application of plaintiffs for an injunction and for a judgment vacating and setting aside the instant orders of the Interstate Commerce Commission is denied and the complaint of plaintiffs is dismissed.

Complaint dismissed.