**CHURCH POINT WHOLESALE BEVER-AGE COMPANY, A Partnership Composed of T. Roy Horecky, Conrad C. Horecky, Sr., Anita G. Guidry, Genevieve H. Daigle, Paulina A. Harmon, and Louis B. Arceneaux; T. Roy Horecky dba Baton Rouge Wholesale Beverage Company; and Church Point Wholesale Grocery Company, Inc.,**

v.

**UNITED STATES of America and The Interstate Commerce Commission, Contract Carrier Conference of American Trucking Associations, Inc. and Midwest Emery Freight System, Inc.; and The Association of American Railroads, Intervenors.**

### Civ. A. No. 8177.

United States District Court
W. D. Louisiana,
Lake Charles Division.

Dec. 29, 1961.

Ainsworth & Ainsworth, New Orleans, La., for plaintiffs.

T. Fitzhugh Wilson, U. S. Atty., Shreveport, La., Fritz R. Kahn, Int. Comm. Comm., Washington, D. C., John

H. D. Wigger, Dept. of Justice, Washington, D. C., for defendants.

Harry J. Breithaupt, Jr., Assoc. Railroads, Washington, D. C., Todd, Dillon & Singer, Washington, D. C., Jones, Kimball, Harper, Tete & Wetherill, Lake Charles, La., Murray Hudson, Monroe, La., for intervenors.

Before BROWN, Circuit Judge, DAWKINS, Chief Judge, and HUNTER, District Judge.

HUNTER, District Judge.

This is an action brought against the United States and the Interstate Commerce Commission, pursuant to the provisions of Sections 1336, 1398, 2284 and 2321–2325 of the Judicial Code, 28 U.S.C. §§ 1336, 1398, 2284 and 2321–2325; Section 17 of the Interstate Commerce Act, 49 U.S.C.A. § 17; and Section 10 of the Administrative Procedure Act, 5 U.S.C. A. § 1009, to enjoin, annul and set aside orders of the Interstate Commerce Commission issued in Docket No. MC–C–2443, Church Point Wholesale Beverage Co. et al.—Investigation of Operations, holding that plaintiffs had been and are engaged in transportation, in interstate commerce, of sugar for compensation as a for-hire carrier without appropriate authority in violation of Section 206(a) or 209(a) of the Interstate Commerce Act, 49 U.S.C.A. §§ 306(a) or 309(a), and requiring plaintiffs to cease and desist from conducting such unlawful transportation.

The jurisdiction of the Court is admitted by all parties and there is no question as to venue.

The Contract Carrier Conference of American Trucking Associations, Inc., Midwest Emery Freight System, Inc., and Association of American Railroads, parties in interest to the proceeding before the Commission, pursuant to Section 2323 of the Judicial Code, 28 U.S.C. § 2323, and Rule 24 of the Federal Rules of Civil Procedure, 28 U.S.C., have been granted leave to intervene as defendants here.

Proceedings Before the Commission

The proceeding before the Commission was entitled Docket No. MC–C–2443, Church Point Wholesale Beverage Co. et al.—Investigation of Operations, and is reported in 82 M.C.C. 457. Pursuant to an order dated September 17, 1958, Division 1 of the Commission instituted an investigation under Section 204(c) of the Interstate Commerce Act, 49 U.S.C. A. § 304(c), and Section 2 of the Elkins Act, 49 U.S.C.A. § 42, into the activities of plaintiffs, for the purpose of determining whether plaintiffs were engaged in the transportation of property by motor vehicle as a common or contract carrier, without requisite authority, in violation of Sections 206(a) or 209(a) of the Interstate Commerce Act, 49 U.S.C.A. § 206(a) or 309(a).

The matter was referred to an Examiner and hearings were held in New Orleans, Louisiana, on January 14, 1959.

On April 7, 1959, the report and recommended order of the Examiner was served upon the parties, wherein the Examiner found that the motor carrier operations conducted by plaintiffs were not for-hire carriage as defined by the Interstate Commerce Act; that plaintiffs were not in violation of the Act, and recommended that the proceedings be discontinued. Exceptions were filed by the Commission's Bureau of Inquiry and Compliance and by intervenors.

By a report and order served March 18, 1960, Division 1 found that the Examiner, while correctly stating the facts, erred in his conclusions with respect to the nature of the transportation conducted by the plaintiffs and the lawfulness thereof. It thereupon reversed the Examiner, finding that plaintiffs were engaged in the unauthorized transportation of sugar in violation of the Interstate Commerce Act, and ordered plaintiffs to cease and desist from continuing such unlawful carriage. The Commission denied plaintiffs' petition for a rehearing and plaintiffs instituted this suit on March 6, 1961.

## Statutes Involved

The pertinent sections of the Interstate Commerce Act are:

Section 206(a), 49 U.S.C.A. § 306(a), requiring a certificate of public convenience and necessity for operation as a common carrier by motor vehicle.

Section 203(a) (14), 49 U.S.C.A. § 303(a) (14), defining a common carrier by motor vehicle as being:

" * * * any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes * * *."

Section 209(a), 49 U.S.C.A. § 309(a), requiring a permit for operation as a contract carrier by motor vehicle.

Section 203(a) (15), 49 U.S.C.A. § 303(a) (15), defining a contract carrier by motor vehicle as:

" * * * any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) of this section and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

Section 203(a) (17) of the Act, 49 U.S.C.A. § 303(a) (17), defining a private carrier by motor vehicle as being:

" * * * any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

Section 203(c) of the Act, 49 U.S.C.A. § 303(c), which controls the instant factual situation, and reads in pertinent part:

"Except as provided in section 202 (c), section 203(b), in the exception in section 203(a) (14), and in the second proviso in section 206(a) (1) [all of which are exemptions from the certification requirement inapplicable herein], no person shall engage in any for-hire transportation business by motor vehicle, in interstate or foreign commerce, on any public highway or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such person a certificate or a permit issued by the Commission authorizing such transportation, nor shall any person engaged in any other business enterprise transport property by motor vehicle in interstate or foreign commerce for business purposes *unless such transportation is within the scope, and in furtherance, of a primary business enterprise (other than transportation) of such person.*" (Italics ours)

## The Law and the Facts

The basic facts in this proceeding are relatively uncomplicated and are not the subject of any substantial conflict between the parties. We restate the pertinent facts necessary to a clear understanding of the issues involved.

Plaintiff, Church Point Wholesale Grocery Company, Inc., is a Louisiana corporation engaged in the wholesale distribution of groceries (including sugar), liquor, beer, wine, feed and wire fencing. It maintains an office building and two warehouses in Church Point, and

distributes to customers within a 200-mile radius of its place of business. Local distribution is performed in 22 company operated trucks, and six tractor-trailer units are utilized for over-the-road movements from various midwestern suppliers to its warehouses. It is one of the largest wholesale grocery houses in Louisiana, having gross annual sales in excess of $10,000,000.

Plaintiff, Church Point Wholesale Beverage Company, is a partnership with main offices and a warehouse at Opelousas, Louisiana. It engages in the wholesale distribution of food and beverages in Opelousas and the nearby vicinity, utilizing three delivery trucks for that purpose. It secures its beer from Milwaukee, Wisconsin, transporting approximately ¾ths of such purchases in its own tractor-trailer combination.

Plaintiff, T. Roy Horecky, is an individual doing business as Baton Rouge Wholesale Beverage Company. The company maintains an office and warehouse in Baton Rouge and is engaged in the wholesale distribution of beer in and around Baton Rouge, Louisiana.

None of these companies hold a certificate or permit from the Interstate Commerce Commission.

Plaintiffs employ their own motor vehicles to perform several transport functions. First, they utilize their vehicles to pick up merchandise from suppliers located outside the State of Louisiana for movement back to their warehouse facilities for storage and re-distribution. Secondly, plaintiffs' vehicles are used to transport merchandise for general distribution to customers in their respective trade areas. Lastly, the equipment is used to pick up sugar from Louisiana sugar refineries for movement to consignees located in the same vicinity where merchandise is purchased for the replenishment of warehouse stock.

It is conceded that plaintiffs are legitimate dealers of beer, groceries and liquor within their respective trade areas, and that their transport of such commodities from their warehouses to customers in Louisiana is private carriage for which no authority is required from the Commission. It is also recognized that the use by plaintiffs of their own equipment to transport merchandise purchased for inventory from suppliers in the Midwest to their Louisiana facilities falls within the same category. It is only the movement of the sugar whose lawfulness is in question.

The procedure for the handling of the sugar transaction is the same for each plaintiff. Collectively, they purchase and transport truckloads of sugar from a New Orleans refinery to northern and midwestern points. The buying, transporting, and selling of the sugar is engaged in solely for the purpose of achieving a two-way movement, and eliminating the cost of dispatching an empty vehicle to the supplier to pick up merchandise for use in plaintiffs' Louisiana wholesale operations. The sugar transactions are generally handled through Fox, a broker for the sugar refinery. Fox arranges both for the purchase of the sugar by plaintiff from the refinery, and for the sale of the sugar by plaintiffs at northern points. After such arrangements are completed, plaintiffs dispatch their trucks to the refinery for loading and then directly to the customers' places of business for unloading. For their transportation of the sugar, the plaintiffs receive the difference between the price they agree with Fox to pay for the sugar at the refinery and the price at which they agree with Fox to sell the sugar at the customers' plants. Plaintiffs pay no commission to Fox for securing customers for the sugar they buy; Fox's entire compensation comes from the commissions paid by the refineries.

In every instance, after delivering the sugar at the customers' plants, the plaintiffs' trucks proceed to one or another of the plaintiffs' suppliers to pick up loads of merchandise to be sold by the plaintiffs at wholesale in Louisiana. *None of the sugar is ever bought and sold and transported to Midwest destinations by*

*the plaintiffs except to provide a revenue-producing northbound movement in connection with a southbound movement of merchandise for the plaintiffs' wholesaling operations.* By this device plaintiffs avoid having to "deadhead" their equipment but, rather, are assured a two-way haul. They have a profit-yielding sugar movement northbound from New Orleans, which enables their trucks efficiently and economically to pick up merchandise from Midwestern suppliers for distribution by the plaintiffs in their wholesaling operations in Louisiana. The Commission, at 82 M.C.C. 459–460, accurately summarized plaintiffs' sugar operations as follows:

"The purchasing and selling of truckloads of sugar is conducted in order to balance their motor vehicle operations from northern points where merchandise is purchased and transported southbound in connection with their wholesale operations in Louisiana. Sugar is purchased and transported to northern points only when need arises for a shipment of merchandise to supply their wholesaling activities. The sugar transactions are generally handled through respondent, Fox, a broker for a sugar refinery in New Orleans, who contacts a representative for respondent wholesalers who acts on their behalf on the sugar transactions. Fox arranges both for the purchase of the sugar by respondent wholesalers from the refinery and for the sale of the sugar by the wholesalers at northern points. Most of the sugar is purchased by respondent wholesalers from the refinery with pre-existing orders from the ultimate purchaser or consumer already on hand. None of the sugar is stored. Respondent wholesalers' vehicles are dispatched from their respective home terminals to the refinery at New Orleans, thence direct to the customer's plant. The sugar is purchased by wholesalers from the refinery with their own funds and title rests with

wholesalers during the transportation to the ultimate buyer."

The Commission distinguished between the nature of the plaintiffs' northbound transportation of sugar and their southbound transportation of groceries, liquor and beer at 82 M.C.C. 460–461, as follows:

"We see two distinct business enterprises which, although related, possess distinct characteristics. On the one hand, there is the wholesaling business of each respondent wholesaler, wherein merchandise is kept in stock and is sold and distributed to their respective customers. In connection with this enterprise and in order to stock their warehouses with a minimum of inventory, respondent wholesalers operate line haul equipment which is used to pick up merchandise from manufacturers and other sources as the need arises. On the other hand, there is another business enterprise conducted by each of the respondent wholesalers, namely, the buying and selling of sugar. Here no inventory is kept, their marketing area is hundreds of miles beyond that of their respective wholesaling businesses, and sugar is purchased, transported to northern points, and sold only when a truckload of merchandise from some northern point is needed in connection with their respective beverage or grocery wholesaling activities."

Plaintiffs have conducted their sugar transactions openly and without attempt at subterfuge. They have refrained from surrounding their sugar operations with the trappings of legitimate interstate wholesaling of sugar. Their position is that all their operations must be viewed as a whole and that the transportation performed by them in the movement of sugar is private carriage incidental to and in furtherance of their primary businesses as wholesalers and local distributors of beer and other specified commodities in Louisiana.

There is agreement that the factual situation here is controlled by section 203(c) of the Act as amended (supra). Plaintiffs suggest that when interpreting 203(c) that consideration should be given to 203(a) (17) (supra). We do not deem it necessary to detail our views as to 203(a) (17). It suffices to say that in interpreting the definition of private carriage to the extent that it has any relevancy here (the transportation of one's own property in one's own vehicle in furtherance of commercial enterprise) the Commission and the courts have adopted and applied to the factual situation, in each individual case, the so-called "primary business" test, and that Congress by enacting 203(c) wrote into the law the interpretation which the Commission and the courts had placed on the private carrier definition of Section 203 (a) (17). (Lenoir Chair Company, 51 M.C.C. 65; Brooks Transportation v. United States, D.C., 93 F.Supp. 517, affirmed 340 U.S. 925, 71 S.Ct. 501, 95 L. Ed. 668.)

Critical in determination of the instant controversy is the realization that 203(c) makes it clear that transportation was not to be regarded as "in furtherance of any commercial enterprise" as that term appears in the private carrier definition (203(a) (17)) merely because it yielded revenues of ultimate benefit to the operators' non-carrier enterprise *or* served to make productive, idle equipment of the non-carrier business. Congress has now spelled out in clear and controlling language its conception of what the primary test is, and as a result thereof no consequence attaches to the question whether these activities meet some abstract or historically standard of "private carriage."

It is characteristic of truck transportation that an outbound movement cannot be performed economically without a subsequent backhaul movement, and vice versa. Hence, there is a tremendous pressure for a carrier, whether he be a private carrier or a for-hire carrier, to balance its operations. Manufacturers and wholesalers, using their own equipment, were quick to learn that this balanced operation—that is, a payload in both directions—was essential to economical operation. The device utilized was simple. The operator would purchase for his own account one or several commodities and upon reaching the destination sell them for an amount sufficient to recoup the purchase price, plus all or part of the cost of transportation. It was and has always been the position of the operator that such movement of property of which he was the owner, transported for the purpose of sale, was exempt from regulation.

The early Interstate Commerce Commission decisions clearly recognized that the mere incidence of title was not determinative of a carrier's status, and that buy and sell operations undertaken principally for the purpose of avoiding non-revenue producing outbound or backhaul truck movements were not such mercantile transactions as would give rise to bona fide private carriage. Mc-Broom Contract Carrier Application, 1 M.C.C. 425; Carpenter Common Carrier Application, 2 M.C.C. 485; Monninger Common Carrier Application, 2 M.C.C. 501; Marini Common Carrier Application, 2 M.C.C. 727; Georgia Common Carrier Application, 3 M.C. 601; Moeller Common Carrier Application, 6 M.C.C. 719; Johnson Common Carrier Application, 10 M.C.C. 4; Schulz Common Carrier Application, 10 M.C.C. 453; Forister Common Carrier Application, 10 M. C.C. 461; Graver Contract Carrier Application, 21 M.C.C. 11.

This so-called primary business test was most clearly enunciated by the Commission in Lenoir Chair Co. Contract Carrier Application, 51 M.C.C. 65 (1949). In that proceeding the applicants were manufacturers who transported in their own trucks the products they had manufactured and, whenever possible, loaded such vehicles with plant supplies for the return movement. Finding these manufacturers to be private carriers, the Commission, at 51 M.C.C. 75, said:

"If the fact establish that the primary business of an operator is

the supplying of transportation for compensation, then the carrier's status is established though the operator may be the owner, at the time, of the goods transported and may be transporting them for the purpose of sale * * *. If, on the other hand, the primary business of an operator is found to be manufacturing or some other noncarrier commercial enterprise, then it must be determined whether the motor operations are in bona fide furtherance of the primary business or whether they are conducted as a related or secondary enterprise with the purpose of profiting from the transportation performed. In our opinion, they cannot be both. A finding that a company is engaged in performing transportation for compensation with a purpose of profiting therefrom is inconsistent with and precludes a finding that the motor operations are conducted in bona fide furtherance of its other and primary commercial enterprise."

The Commission's determination was challenged before a statutory three-judge court, and in Brooks Transp. Co. v. United States, 93 F.Supp. 517, 522 (E.D. Va.1950), aff'd mem. 340 U.S. 925, 71 S.Ct. 501, 95 L.Ed. 668 (1951), the assailed actions of the Commission, including its application of the primary business test, were sustained, as follows:

"The Commission, in deciding that Lenoir and Schenley were private carriers, as opposed to contract carriers, or common carriers, applied what is known as the *primary business test*. In other words, if it is established that the primary business of a concern is the manufacture or sale of goods which the owner transports in furtherance of that business and the transportation is merely incidental thereto, the carriage of such goods from the factory or other place of business to the customer is private carriage even though a charge for transportation is included in the selling price or is added thereto as a separate item. The Commission has so held consistently in its interpretation of the statutory provisions regulating the various categories of motor carriers. See, Congoleum-Nairn, Inc., Common Carrier Application, 2 M.C.C. 237; D. L. Wartena, Inc., Common Carrier Application, 4 M.C.C. 619; Swanson Contract Carrier Application, 12 M.C.C. 516; Murphy Common Carrier Application, 21 M.C.C. 54; Dull Contract Carrier Application, 32 M. C.C. 158; Woitishek Common Carrier Application, 42 M.C.C. 193."

The primary business test, affirmed in Brooks, has been consistently followed by the Commission whenever a question has arisen as to the private or for-hire carrier status of any business undertaken which included the performance of truck transportation. Golden Common Carrier Application, 61 M.C.C. 57, 58 (Comm. 1952); Burlington Mills Corp., Transp. for Compensation, 53 M.C.C. 327, 333 (Comm.1951); Watson Mfg. Co., Inc., Common Carrier Application, 51 M.C.C. 223, 225 (Div. 5, 1949). Though the Commission in proceedings before it found little difficulty in distinguishing, under the primary business test, between private and for-hire carriage, and was able to evolve a consistent line of cases applying that test, it encountered mixed reaction in seeking judicial aid in its enforcement of the Act. In a series of cases the Commission met with failure in its efforts to have carriers engaged in what it deemed to be spurious buy and sell operations enjoined from continuing such transportation. Taylor v. Interstate Commerce Commission, 209 F.2d 353 (9th Cir., 1953), cert. denied 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098 (1954); Interstate Commerce Commission v. Woodall Food Prod. Co., Inc., 207 F.2d 517 (5th Cir., 1953); Interstate Commerce Commission v. Tank Car Oil Corp., 151 F.2d 834 (5 Cir., 1945); Interstate Commerce Commission v. Clayton, 127 F.2d 967 (10th Cir., 1942). In other cases, however, the courts sustained the views of the Commission.

Scott v. Interstate Commerce Commission, 213 F.2d 300 (10th Cir., 1954); A. W. Stickle & Co. v. Interstate Commerce Commission, 128 F.2d 155, 159 (10 Cir., 1942, cert. denied 317 U.S. 650, 63 S.Ct. 46, 87 L.Ed. 523 (1942); Interstate Commerce Commission v. Asphalt Supply Co., 152 F.Supp. 559, 561 (N.D. Tex.1957). Against this background of decisions by the courts, the Commission, beginning in 1954, invited the attention of the Congress to the increasing employment of buy and sell operations in the transporation of freight and to the resulting competitive impact upon the regulated for-hire carriers.

Congress did amend the Act as part of the 1957 legislation redefining contract carriage. Section 1(2) of Public Law 85–163, 71 Stat. 411, added a new subsection to section 203 of the Act, 49 U.S. C.A. § 303, providing as follows:

"Except as provided in section 202(c), section 203(b), in the exception in section 203(a) (14), and in the second proviso in section 206(a) (1), no person shall engage in any for-hire transportation business by motor vehicle, in interstate or foreign commerce, on any public highway or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such person a certificate or a permit issued by the Commission authorizing such transportation."

However, the added language of section 203(c) was not believed to be sufficiently clear, and the following year the Chairman of the Interstate Commerce Commission again testified before the cognizant committees of both houses of Congress in support of additional legislation "to curb carriage for compensation under the cloak of buy-and-sell operations." Hearings on Problems of the Railroads Before the Sub-Committee on Surface Transportation of the Senate Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess. 1832 (1958); Hearings on Railroad Problems Before a Sub-committee of the House Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess. 109 (1958).

Section 203(c) of the Act subsequently was amended by the Transportation Act of 1958, 72 Stat. 574, by the addition of the last clause, specifically providing that "[no] *person engaged in any other business enterprise [shall] transport property by motor vehicle in interstate or foreign commerce for business purposes unless such transportation is within the scope, and in furtherance, of a primary business enterprise (other than transportation) of such person.*"

■ In speaking of the amendment the report of the Senate Committee on Interstate and Foreign Commerce, S.Rep. No. 1647, 85th Cong., 2d Sess. 5, 23–25 (1958), said, in part:

"Various subterfuges are employed to evade economic regulation and avoid imposition of the transportation excise taxes. The one most commonly used is the so-called buy-and-sell method of operation involving the issuance of bills of sale, invoices, and other such instruments to make it appear that the commodities being transported are those of the vehicle owner when in fact the transportation is merely a device to provide transportation for hire without a certificate or permit and without payment of the transportation tax. Another is the backhaul method of operation increasingly engaged in by concerns that deliver in their own trucks articles which they manufacture or sell and then purchase merchandise at or near their point of delivery for transportation back to a point near their own terminal for sale to others, or where they transport property they do not own, such transportation being performed only for the purpose of receiving compensation for the otherwise empty return of their trucks.

\* \* \* \* \* \*

"With the Interstate Commerce Act amended in this way commercial

highway transportation of property in interstate or foreign commerce would, with certain specific exemptions, be required to fall into one or another of three classes: (a) duly certified common carriage, (b) duly permitted contract carriage, or (c) transportation solely within the scope and furtherance of a primary business enterprise (other than transportation) of the transporter. Other commercial highway transportation, except as specifically provided would be prohibited. This, it is believed, would serve to correct most of the abuses that have arisen in the name of private carriage and yet would not in any way jeopardize or interfere with what might be called legitimate or bona fide private carriage. Indeed the 'primary business test' contained in Brooks Transportation Co. v. U. S. (340 U.S. 925 [71 S.Ct. 501, 95 L.Ed. 668] (1951)), so sacrosanct to the private carriers and deemed by them essential to their best interests, and the preservation of their rights, would be written directly into the statute."

From this report it is obvious that Congress, in enacting this legislation, codified the "primary business" test laid down in Lenoir and affirmed in Brooks. It is clear from the legislative history that the actual purpose of the amendment was to preclude operations conducted in the guise of private carriage.[1]

■ The language of the amendment is clear. Its purpose is unmistakable. The legislation clearly precludes all transportation conducted in connection with a commercial enterprise, unless the same is "within the scope" and "in furtherance of a primary business enterprise other than transportation." Both tests must be satisfied. Surely, plain-

tiffs' transportation of sugar to the midwest meets neither of these tests. The only relationship between the movement of sugar and plaintiffs' primary business of wholesaling is that the sums realized from the movement of the sugar serve to reduce the cost of conducting plaintiffs' other transportation activities. Surely, plaintiffs cannot be said to be in the business of the interstate wholesaling of sugar. Plaintiffs do not actively solicit customers for sugar, conduct no advertising of same, dispatch their trucks to carry sugar only when they are dispatched to pick up beer or groceries in the Midwest, and transport only sugar that is purchased under pre-existing orders. They have no investment in facilities other than equipment used in the transportation of the sugar and employ no personnel except those who drive the vehicles. The only service identifiable as such which plaintiffs actually perform for the ultimate purchaser of the sugar and from which they derive a profit is transportation.

The Commission's conclusion that plaintiffs' transportation of sugar falls within the prohibition of 203(c) is responsive to the plain language of the statute and is in complete accord with the Commission's construction thereof since its enactment. Donald L. Wilson et al.—Investigation of Operations, 82 M.C.C. 651 (Div. 1, 1960); Mumby Investigation of Operations, 82 M.C.C. 237 (Div. 1, 1960); Fraering Brokerage Co., Inc.—Investigation of Operations, 81 M.C.C. 337 (Div. 1, 1959);[2] Stutzman—Investigation of Operations, 81 M.C.C. 223 (Div. 1, 1959); Subler Transfer, Inc.—Investigation of Permits, 79 M.C.C. 561 (Div. 1, 1959); Riggs Dairy Exp., Inc.—Investigation and Revocation, 78 M.C.C. 574 (Div. 1, 1958); Monkem Co., Inc.—Investigation of Operations, 78 M.C.C. 152 (Div. 1, 1958).

1. House Committee on Interstate and Foreign Commerce, H.R.Rep. No. 1922, 85th Cong., 2d Sess., 17–18 (1958), U.S. Code Cong. and Adm.News 1958, p. 3456.

2. Appeals pending in C.A. No. 1003 before the U. S. District Court for the Eastern District of Louisiana, and C.A. No. 2840 before the U. S. District Court for the Western District of Texas. Defendants are unaware of any reported court decisions construing section 203 (c), and, thus, in a sense, this is a case of first impression.

### Conclusion

Plaintiffs' transportation of sugar to Midwest destinations in order to be lawful, since it is unauthorized, must be within the scope and in furtherance of their primary business as distributors at wholesale of groceries, liquor and beer within Louisiana. The relationship between the two distinct operations is tenuous at best. While the northbound transportation of sugar reduces the allocation of round-trip costs assignable to the merchandise picked up for wholesale distribution in Louisiana, this economic benefit accruing to the noncarrier business enterprise of the plaintiffs is too remote to place such transportation within the regulatory exemption afforded private carriage by the Act. But for the mechanics of assuming title to the sugar they transport, there would be no question that the plaintiffs are engaged in for-hire carriage in their northbound transportation. They concede that they handle the sugar for the profit accruing therefrom. That such transportation additionally achieves certain economies and efficiencies beneficial to the plaintiffs' wholesaling activities is not controlling. Plaintiffs' justification of their northbound transportation would make a nullity of the primary business test expounded by the Commission, sustained by the courts and ratified by the Congress in the enactment of Section 203(c) of the Act, for it would permit any person engaged in any other business enterprise to transport property by motor vehicle, irrespective of whether such transportation is, in fact, within the scope or in furtherance of such person's primary business enterprise, if the performance of the transportation makes possible more profitable utilization of the equipment used in the primary business enterprise.

Substantial evidence of record and applicable law support the Commission's finding that the plaintiffs have engaged in the unauthorized motor-carrier transportation of sugar from New Orleans, Louisiana, to points in the Midwest, in violation of Section 206(a) or 209(a) of the Act. The Commission's order, requiring plaintiffs to cease and desist from all such for-hire operations until appropriate authority therefor is obtained from the Commission, is valid and lawful in all respects. This Court will deny plaintiffs the relief they seek and dismiss their complaint. It is so ordered.