STATE of Texas, Petitioner,

v.

Tom BOUNDS et al., Respondents.

No. B–8643.

Supreme Court of Texas.

July 30, 1980.

Rehearing Denied Oct. 8, 1980.

Mark White, Atty. Gen., R. Lambeth Townsend, Asst. Atty. Gen., Austin, for petitioner.

Bonner & Bonner, William L. Hubbard and Curtis Bonner, Harlingen, for respondents.

SPEARS, Justice.

This appeal by the State of Texas challenges the holdings of the courts below that respondent Tom Bounds was not engaged in the business of "transporting property for compensation or hire" and therefore, was not required to obtain a permit from the Railroad Commission of Texas. The trial court denied the State's request for civil penalties and injunctive relief under Tex. Rev.Civ.Stat.Ann. art. 911b (Vernon). The court of civil appeals affirmed. 581 S.W.2d 799. We reverse and remand to the trial court with instructions.

The material facts are undisputed. Respondent Mercedes Co-operative Gin, a cotton gin operation, sold its by-product, cottonseed, to Valley Co-op Oil Mill for a specific sales price plus the per ton freight rate set by the Railroad Commission for regulated cottonseed shipments. Prior to the 1976 ginning season, the Gin used its own fleet of trucks to transport the cottonseed to the

Valley Co-op Oil Mill. In 1976, for reasons unexplained in the record, the Gin changed its operation and began using three trucks leased from Bounds to transport the cottonseed from the Gin to Valley Co-op.

Tom Bounds' trucking operation, a sole proprietorship, consisted of six trucks. During the 1976 ginning season, he leased three of the trucks to the Gin and operated the others under a permit used for hauling cotton. Three written leases, each for a term of 120 days, were entered into for the three trucks leased by Bounds to the Gin on forms' prepared by the Gin. Each lease provided for a rental compensation to Bounds of 60-cents per mile for each mile the Gin operated that truck. Two of the leases were dated June 7, 1976; the third lease was dated August 5, 1976. The three leases contained identical language. Each lease provided that the Gin would furnish all oil and gasoline necessary to operate the trucks during the lease period and that the Gin would furnish all drivers for the trucks. Each lease further provided that the Gin would have full control of the truck and the driver. Copies of these written leases were filed with the Department of Public Safety as required by Tex.Rev.Civ.Stat.Ann. art. 6701c–1, § 2 (Vernon).

Although the written leases required the Gin to maintain public liability insurance on the leased trucks, neither Bounds nor the Gin did so. The Gin manager did testify, however, that he thought the drivers would be covered under an "umbrella" policy covering losses over $500,000.

At some point, allegedly two or three weeks subsequent to the execution of the written leases, Bounds and the Gin modified the written leases by oral agreement. Their oral agreement was that Bounds would receive 60-cents per mile, as provided by the leases, or the difference between the revenues received for hauling the cottonseed and the expenses the Gin incurred in

operating the trucks, whichever was the greater sum. No written memorandum of this oral agreement was filed with the Department of Public Safety despite the requirement of § 2 of art. 6701c–1 that there be filed "an executed copy of the lease, memorandum or agreement under which such commercial motor vehicle or truck-tractor *is being operated.*" (emphasis added).

Although the leases provided for compensation of 60-cents per mile for each of the trucks, computed from the speedometer readings at the beginning and end of the lease period, no record of the speedometer readings of the trucks was made. Instead, the Gin maintained an "accounts receivable" for Bounds to keep track of the expenses of the truck operation. The account was claimed as an asset on the Gin's audited financial statements. Posted to that account were all of the purchases of oil and gasoline, wages and social security for the drivers, purchases and other expenses relating to the trucks, and advances to Tom Bounds.

On October 4, 1976, after the ginning season, the revenues and expenses were totaled and a final settlement of the trucking arrangement made. The Gin paid Bounds $11,741.46, representing the total per ton freight rates collected by the Gin from the Valley Co-op, and Tom Bounds paid the Gin the total of the trucking expenses as reflected by the account receivable, $5,127.62. It was stipulated that Bounds had no permit from the Railroad Commission to transport cottonseed for hire and that the hauling of the cottonseed here was done in Bounds' trucks over the highways of the state between two or more incorporated cities.

 There is no dispute that Bounds was a "motor carrier" under the definition found in article 911b, § 1(g) [1] and that he

1. (g) The term "motor carrier" means any person, firm, corporation, company, copartnership, association or joint stock association, and their lessees, receivers, or trustees appointed by any court whatsoever owning, controlling, managing, operating, or causing

to be operated any motor-propelled vehicle used in transporting property for compensation or hire over any public highway in this state, where in the course of such transportation a highway between two or more incorporated cities, towns or villages is traversed.

was not a common carrier or a specialized motor carrier. In order for the State to establish that Bounds was a contract carrier for the cottonseed under the provisions of article 911b, sec. 1(h),[2] it is necessary to show that he was "transporting property for compensation or hire." That term is defined in sec. 1(j), which, in pertinent part, reads:

(j) The term "transporting property for compensation or hire" shall include *the furnishing during the same period of time of equipment and drivers* to persons, firms, co-partnerships, associations or joint stock associations *other than common carriers, contract carriers, specialized motor carriers* for use in their carrier operations whether the equipment and drivers are furnished by the same or separate person, firm, co-partnership, association or joint stock association, and their lessees, receivers or trustees appointed by any court whatsoever owning, controlling, managing, operating or causing to be operated any motor-propelled vehicle. . . . (emphasis added).

Section 3 of the Act provides that no motor carrier shall operate as a contract carrier without first having obtained a permit from the Railroad Commission. Neither Bounds nor the Gin had such a permit.

■ Since the highways of the State are public property, the power of the State to regulate traffic and to regulate the use of those highways for purposes of gain is well settled. This power includes the right to permit or prohibit motor vehicles, operated for compensation or hire, to use the public highways under such rules and regulations as the legislature may prescribe and implement through the Railroad Commission. *New Way Lumber Co. v. Smith*, 128 Tex. 173, 96 S.W.2d 282, 285 (1936).

■ Whether Bounds was engaged in transporting cottonseed for compensation or hire in this case depends on whether he furnished the Gin both equipment and drivers under sec. 1(j). If he did, he was transporting the cottonseed for compensation or hire and thus, was a contract carrier who was required to obtain a permit to operate as such.

■ Under the terms of the oral agreement between Bounds and the Gin, Bounds ultimately paid for all expenses of the operation of the trucks, including the wages of the drivers. The Gin merely advanced the funds to Bounds for the expenses as reflected in the posting of those advances of an account receivable in Bounds' name. Although the truck drivers were nominally employees of the Gin, which exercised control and supervision of the drivers during the lease period, the undisputed evidence was that the Gin treated the drivers differently from its regular employees. The drivers were not covered by the Gin's workers' compensation policy and did not remain employees of the Gin after final settlement of Bounds' account receivable. The drivers were not paid by payroll checks; instead, they were paid by the load delivered on "accounts receivable" checks which were posted to the account receivable of Bounds. No deductions for withholding of income tax were made by the Gin for the drivers, although there is some evidence that the Gin deducted social security contributions.[3] The Gin's regular employees, on the other hand, were paid on payroll checks, and their wages charged to the expenses of the Gin's operation.

In the final analysis, even though the Gin advanced the funds, Bounds actually paid the wages of the truck drivers, which, of itself, establishes a significant relationship and connection between Bounds and the

---

**2.** (h) The term "contract carrier" means any motor carrier as hereinabove defined transporting property for compensation or hire over any highway in this State other than as a common carrier.

**3.** While the Gin manager testified that the Gin deducted and paid social security contributions

from the drivers' checks, the Gin's bookkeeper had no knowledge of it nor do the amounts of the drivers' checks taken from the checkbook and posted to Bounds' account receivable ledger page reflect any such deductions. Payroll records were kept on the regular Gin employees but not on the truck drivers.

drivers of the leased trucks. Under the circumstances, it is not determinative that the drivers were subject to the control and supervision of the Gin during the lease period.

■ We have already noted the non-compliance of Bounds and the Gin with the requirements of sec. 2 of art. 6701c–1. That section provides:

Sec. 2. No commercial motor vehicle nor any truck-tractor shall be operated over any public highway of this state by any person other than the registered owner thereof, or his agent, servant or employee under the supervision, direction, and control of such registered owner *unless such other person under whose supervision, direction and control said motor vehicle or truck-tractor is operated* shall have caused to be filed with the Department an executed copy of the lease, memorandum or agreement under which such commercial motor vehicle or truck-tractor is being operated. (emphasis added).

Under this statute, it was the responsibility of the Gin to file with the Department of Public Safety an executed copy of the agreement under which the leased truck was being operated. The effect of the failure to file this instrument was to leave the false impression that Bounds was to be compensated solely at the rate of 60-cents per mile. If the true agreement had been filed, it would have alerted the Department, which was charged with the responsibility of enforcing the provisions of art. 911b, to the fact that Bounds was furnishing both equipment and drivers.

■ It is clear that the manner in which Bounds and the Gin handled the entire arrangement shows an attempt to mask the for-hire nature of the truck operation from the state authorities responsible for the enforcement of the provisions of art. 911b requiring that Bounds obtain a permit. The Gin was a mere conduit through which the revenues collected from Valley Co-op and the total expenses of the truck operation were funneled to Bounds. The transactions were structured in such a way that the true nature of their arrangement would be difficult for the authorities to discover. For example, although Bounds and the Gin manager testified that the oral agreement modifying the written leases was entered into within two or three weeks after the first two leases dated June 7, the third lease dated August 5 did not reflect the modification. Significantly, too, the arrangement was entered into at the suggestion of the Gin's manager. In sum, the arrangement of superseding the written leases with the terms of the oral agreement as a matter of law constituted a subterfuge designed to avoid the provisions of article 911b requiring Bounds to obtain a permit. If the legislature had not intended for the term "furnishing" to include economic furnishing as well as physical furnishing, evasion of the purposes of the act requiring a permit to operate as a contract carrier would be easily within the reach of the ingenuity of the clever. We hold that Bounds "furnished" the drivers of the leased trucks under the meaning and intent of sec. 1(j) of article 911b. Here, Bounds was required to obtain a permit from the Railroad Commission as a contract carrier and was in violation of the act for failing to do so.

■ The court of civil appeals further held that the Gin was a private motor carrier under the exception contained in § 1a(1)(a) of the Act which reads:

Sec. 1a. (1) Provided, however, that the term "Motor Carrier" and the term "Contract Carrier" as defined in the preceding Section shall not be held to include:

(a) Any person having a regular, separate, fixed, and established place of business, other than a transportation business, where goods, wares, and merchandise are kept in stock and are primarily and regularly bought from the public or sold to the public or manufactured or processed by such person in the ordinary course of the mercantile, manufacturing, or processing business, and who, merely incidental to the operation of such business, transports over the highways of this state such goods of which such person is the bona fide owner by means of a motor

vehicle of which such person is the bona fide owner . . ..

In *State v. Logue*, 376 S.W.2d 567, 572 (Tex.1964), we held that one who leases trucks can be exempted under § 1a(1)(a) from the requirements of obtaining a permit even though the lessor is not the bona fide owner of the trucks "so long as the driver is one of its regular employees and not furnished by some other party." Under the facts discussed in the instant case, it cannot be said that the drivers used by the Gin to haul cottonseed in the leased trucks were "regular" employees of the Gin. Thus the exemption of § 1a(1)(a) is not applicable to the Gin.

The decisions in *State v. Wiergate Lumber Co.*, 582 S.W.2d 258 (Tex.Civ.App.—Beaumont 1979, writ ref'd n. r. e.) and *State v. Woodville Lumber Co.*, 557 S.W.2d 572 (Tex.Civ.App.—Beaumont 1977, no writ) are distinguishable. In both cases, the company owned the trucks used, paid the wages of the drivers who were on its payroll, paid for workers' compensation insurance for the drivers, and carried public liability insurance on the trucks.

▮ The State also contends that the Gin is subject to the penalties prescribed by the Act in sec. 16(b) as one who "procures, aids or abets in the violation of any provision of this Act . . .." Under the facts discussed, it is clear that by suggesting the oral arrangement, failing to file a memorandum of the oral arrangement with the Department of Public Safety as required, and by implementing the details of the arrangement, the Gin assumed an active role in procuring, aiding, and abetting the violation of the Motor Carrier Act by Bounds.

The judgment of the court of civil appeals is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion.

GARWOOD, J., dissents in an opinion in which BARROW, J., joins.

GARWOOD, Justice, dissenting.

I dissent from the holding that as a matter of law Bounds was "furnishing . . drivers" to the Gin within the meaning of Section 1(j) of Article 911b. The expense of the drivers' wages was ultimately borne by Bounds in the sense that the compensation paid him by the Gin on termination of the lease was the excess of the regular rates for hauling the cottonseed over the Gin's direct expenses in operating the trucks (exclusive of social security and payroll taxes on the drivers). There is no finding, and the evidence does not conclusively establish, that Bounds would have been liable to the Gin if its expenses had exceeded its revenues, or that Bounds had any obligation to the drivers respecting wages or anything else, or that they had any obligation of any kind to him. Although the evidence shows the Gin in some respects treated the drivers differently than its other employees, there is no finding, and the evidence does not conclusively establish, that such treatment was other than wholly optional with the Gin so far as its arrangements with Bounds were concerned. While it may well be that under the evidence the trial court could have found that the arrangements between Bounds and the Gin were a subterfuge, and that in substance the drivers were actually furnished by Bounds, no such findings were made here. On the contrary, the trial court rendered judgment for Bounds and the Gin, and its findings of fact, as accurately summarized by the court of civil appeals, included the following:

> Bounds did not have, nor did he exercise, any authority to hire or fire any of the truck drivers who drove the leased trucks; Bounds did not have, nor did he exercise, any authority relating to the rate of pay, working hours, or details of job performance with respect to the truck drivers; Bounds did not have, nor did he exercise, any authority as to the maintenance of the trucks; Bounds had no right to control the hauling operations; and the Gin had the exclusive right to control the hauling operations. 581 S.W.2d 799 at 802.

None of the trial court's fact findings are challenged by the State as being contrary to the undisputed evidence 'or as being based on no evidence, and such findings are consequently binding on this court. In my opinion "furnishing . . . drivers" as used in Section 1(j) means something more than crediting the "furnished" party with the costs it incurs in furnishing its own drivers. In order for one party to be "furnishing . . . *drivers*" to another under Section 1(j) there must be a relationship or connection between the *drivers* and the party who is allegedly furnishing them. No relationship or connection whatever between Bounds and the drivers has been found here, nor does the court's opinion point to any such conclusively established by the evidence. This is not to say that courts should disregard the substance of a transaction, or that they are. bound by its form. If the trial court had found (or if the evidence conclusively established) that Bounds *in fact* hired or selected the drivers, or controlled them, or that there was some significant relationship or connection between Bounds and the drivers, so that they were in substance furnished by him, then, despite the paper work, it would be proper to regard them as having been furnished by Bounds under Section 1(j). But the fact findings, which are not challenged, are to the contrary. So, as we must view the case, Bounds did not furnish the Gin equipment *and* drivers; the Gin furnished its own drivers; Bounds furnished the Gin equipment and a credit on its rental equal to the Gin's operating costs. I therefore dissent from the holding that as a matter of law Bounds was "furnishing during the same period of time . . . equipment and drivers" to the Gin within the meaning of Section 1(j).[1]

BARROW, J., joins in this dissent.

[1]. The State of Texas also contends that even if Bounds did not furnish the Gin both equipment and drivers as provided in Section 1(j), he nevertheless was required to have a permit because under his arrangement with the Gin he retained, according to the State, "in significant measure the characteristic burdens of a trans- portation business" under the doctrine of *U. S. v. Drum*, 368 U.S. 370, 82 S.Ct. 408, 7 L.Ed.2d 360 (1962). As the majority opinion does not reach this question, no purpose would be served by its consideration in this dissenting opinion.